IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| TOM HESS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 11-CV-482-GKF-FHM |
| | ) | |
| JAMES R. CHILDERS, ARCHITECT, INC., | ) | |
| a corporation | ) | |
| | ) | |
| Defendant. | ) | |

---

## DEFENDANT'S MOTION FOR

## SUMMARY JUDGMENT AND BRIEF IN SUPPORT

---

DOERNER, SAUNDERS, DANIEL &
ANDERSON, L.L.P.

Kristen L. Brightmire, OBA No. 14239
Kenneth T. Short, OBA No. 22712
Williams Center Tower II
Two West Second Street, Suite 700
Tulsa, OK  74103-3117
Telephone (918) 591-5204
Facsimile (918) 925-5204

Attorneys for Defendant

# I.  INTRODUCTION

Plaintiff is a nonregistered "intern" architect with nearly 20 years of experience as an intern architect and project manager.  Defendant is an architectural firm with offices in Fort Smith, Arkansas and Tahlequah, Oklahoma.  In July of 2010, Plaintiff became employed by Defendant as an intern architect and project manager.

Plaintiff alleges he is entitled but did not receive compensation for overtime hours worked in violation of the Fair Labor Standards Act ("FLSA").  Plaintiff's claim fails, as a matter of law.  Plaintiff was employed as and performed the duties of an intern architect.  Accordingly, the professional exemption of § 207 of the FLSA applies and, therefore, Plaintiff is not entitled to overtime compensation.

# II.  STATEMENT OF FACTS

**A.      General Facts**

1.      Defendant is an architectural firm with offices located in Fort Smith, Arkansas and Tahlequah, Oklahoma.  Affidavit of James Childers, attached as Exhibit "1" at ¶ 2.

2.      Plaintiff is a nonregistered "intern" architect.  Deposition of Plaintiff, attached as Exhibit "2" at P. 17, l. 4 – P. 20, l. 20 and Plaintiff's Resume, attached as Exhibit "3."

3.      Plaintiff received his Bachelor of Architecture in 1994 from the University of Oklahoma.  Ex. 2 at P. 11, ll. 2-11.  Plaintiff has also received post-graduate education in the field of architecture.  Ex. 2 at P. 12, ll. 17-25.

4.      Nonregistered architects are persons who have received a degree in architecture and work as architects, but have not passed the exams required to be a licensed architect.  Nonregistered architects are commonly referred to as "intern" architects.  Ex. 1 at ¶4.

5.      An intern architect can perform the same duties as a licensed architect, but cannot stamp or sign and seal drawings.  Deposition of Shane Boren, attached as Exhibit "4" at P. 8, ll.

8-10 and Deposition of Jennifer Hart, attached as Exhibit "5" at P. 9, l. 23 – P. 11, l. 10 and

Deposition of Breck Childers, attached as Exhibit "6" at P. 7, ll. 14-21.

6.      Plaintiff has worked as either an intern architect or project manager for nearly 20

years.  See Ex. 3.

7.      The American Institute of Architects ("AIA") provides "Definitions of Positions"

utilized in the field of architecture.  AIA Definitions of Positions, attached as Exhibit "7."

8.      The AIA defines a "Project Manager" as follows: "Licensed architect or

nonregistered graduate with more than 10 years of experience; has overall project management

responsibility for a variety of projects or project teams, including client contact, scheduling, and

budgeting."  See Ex. 7.

9.      Plaintiff was hired by Defendant on July 9, 2010 as an intern architect and project

manager.  New Hire Information Form, attached as Exhibit "8;" Plaintiff's Emails, attached as

Exhibit "9;" Ex. 2 at P. 55, ll. 22-25 and P. 56, l. 22 – P. 57, l. 6; Ex. 5 at P. 14, ll. 8-19.

10.      Plaintiff's weekly salary while employed by Defendant was $1,009.61 per week.

Plaintiff's Pay History, attached as Exhibit "10."

11.      Defendant subjectively believed that Plaintiff was not entitled to overtime

compensation.  See Ex. 1 at ¶ 9.

12.      Plaintiff was laid off by Defendant on June 10, 2011 for lack of work.

Termination / Separation Notice, attached as Exhibit "11" and Ex. 2 at P. 96, ll. 11-20.

**B.      Vinita Project**

13.      After being hired by Defendant, Plaintiff was assigned to be the project manager

for the construction of a health clinic for the Cherokee Nation in Vinita, Oklahoma ("Vinita

Project").  Ex. 2 at P. 58, ll. 2-16 and Ex. 5 at P. 14, ll. 15-19.

14.     As project manager, Plaintiff was responsible for overseeing the development and construction of the health clinic and ensuring the completion of a number of tasks during development and construction.  Ex. 1 at ¶ 6.

15.     Plaintiff's duties as project manager included working with third-party engineers and consultants.   On numerous occasions, Plaintiff communicated and consulted with several structural and civil engineers and consultants regarding the development and construction of the health clinic.  Ex. 2 at P. 60, l. 24 – P. 65, l. 12.

16.     Plaintiff worked extensively with structural engineers to ensure the design and floor plans were correct and the building would be structurally sound.   Plaintiff met with structural engineers via audio and video conferencing to discuss the building's bracing and spine and to determine what modifications needed to be made to the building's existing design and floor plan.  Ex. 2 at P. 60, l. 24 – P. 76, l. 13.

17.     In conjunction with meeting with engineers and consultants, Plaintiff developed, designed, modified and edited the floor plans and 3D concept for the Vinita health clinic.  Ex. 2 at P. 61, l. 14 – P. 62, l. 1.

18.     Using architectural design and drawing software such as Revit and/or AutoCAD, Plaintiff corrected and edited errors in the existing design and floor plans to ensure the building was structurally sound.   Plaintiff also received and incorporated requested edits and modifications to the design and floor plans from the structural engineers. Ex. 2 at P. 61, l. 14 – P. 76, l. 13.

19.     Plaintiff also relayed the Vinita Project's construction schedule to the outside consultants and engineers. Ex. 2 at P. 71, ll. 11-23.

20.     Using the same architectural design and drawing software, Plaintiff also edited the floor plans to meet the client's design requirements.  Among other edits, Plaintiff readjusted rooms, changed the size of rooms, altered the height of ceilings, and changed building materials. Ex. 2 at P. 66, l. 7 – P. 69, l. 4.

21.     Using the same architectural design and drawing software, Plaintiff also edited and corrected the design and floor plans to ensure they complied with building codes.  Ex. 2 at P. 74, l. 18 – P. 75, l. 24.

22.     Plaintiff's duties on the Vinita Project also included coordinating the installation of medical equipment in the building and ensuring the required medical equipment was incorporated into the building design and floor plan.  In performing this task, Plaintiff worked with electrical engineers to determine if the required medical equipment would fit with the existing design concept.  Ex. 2 at P. 76, l. 20 – P. 77, l. 24.

23.     Plaintiff also coordinated and communicated with civil engineers to ensure the site chosen for the building was suitable and workable.  Ex. 2 at P. 78, ll. 3-19.

C.     **Tishomingo Project**

24.     During his employment with Defendant, Plaintiff also worked as an intern architect on the development and construction of a health clinic for the Chickasaw Tribe in Tishomingo, Oklahoma ("Tishomingo Project").  Ex. 2 at P. 78, l. 20 – P. 79, l. 6.

25.     Plaintiff's primary duty on the Tishomingo Project was coordinating the installation of medical equipment requested by the client to be installed in the building and ensuring that the required medical equipment was incorporated into the building design and floor plan.  Ex. 2 at P. 79, l. 11 – P. 80, l. 11.

26.     To coordinate the installation of the requested medical equipment, Plaintiff edited the existing floor plan to accommodate the requested medical equipment.  Ex. 2 at P. 79, l. 14 – P. 81, l. 4.

27.     Plaintiff also communicated with product manufacturers to determine and obtain detailed technical information regarding particular medical equipment.  Ex. 2 at P. 81, l. 4 – P. 82, l. 4.

28.     After obtaining the requested information, Plaintiff communicated with electrical engineers regarding the location of the medical equipment and the design of electrical panels to accommodate the equipment.  Ex. 2 at P. 81, l. 11 – P. 82, l. 4.

**D.     Ardmore Project**

29.     During his employment with Defendant, Plaintiff also worked as an intern architect on the development and construction of a health clinic for the Chickasaw Tribe in Ardmore, Oklahoma ("Ardmore Project").  Ex. 5 at P. 15, ll. 8-13.

30.     Plaintiff primarily worked with Jennifer Hart on the Ardmore Project.  Ex. 5 at P. 15, l. 16 – P. 16, l. 5 and P. 21, ll. 10-14.  Hart is an intern architect employed by Defendant in the Fort Smith office.  Ex. 5 at P. 10, ll. 11-15.

31.     Plaintiff's primary duties on the Ardmore Project were in the areas of production and design.  Ex. 5 at P. 15, ll. 19-20.

32.     Among other duties, Plaintiff, using Revit and/or AutoCAD, modified and edited the existing floor plans.  Plaintiff was responsible for adding detail, such as window details, to sections of the floor plans.  Ex. 5 at P. 16, ll. 3-17 and Ex. 2 at P. 85, ll. 1-17.

33.     During the Ardmore Project, Plaintiff also met with the client for equipment planning purposes to discuss the types of medical equipment that the clinic would need to accommodate.  Ex. 5 at P. 24, ll. 3-10.

E.      **University of Arkansas Project**

34.     During his employment with Defendant, Plaintiff also worked as an intern architect on the development and construction of a speech and hearing clinic for the University of Arkansas.  Ex. 4 at P. 16, ll. 10-17.

35.     Plaintiff primarily worked with Shane Boren on the University of Arkansas Project.  Ex. 4 at P. 25, ll. 19-23 and P. 26, ll. 5-8.  Boren is an intern architect employed by Defendant in the Tahlequah office.  Ex. 4 at P. 7, ll. 4-19 and P. 9, ll. 18-24.

36.     When Plaintiff began working on the University of Arkansas Project, the Project was in the construction administration phase and the building was being constructed.  Ex. 4 at P. 41, ll. 15-17.

37.     Plaintiff's primary duty on the University of Arkansas Project was orchestrating the layout of shop drawings.  Ex. 2 at P. 86, ll. 12-18.  Shop drawings are representations of what contractors are proposing to build or supply to meet their contractual requirements for a building.  Ex. 2 at P. 86, ll. 22-25.

38.     Plaintiff communicated with and received data, information, and shop drawings from contractors working on the project and ensured that the data and information was properly recorded.  See Ex. 2 at P. 86, l. 11 – P. 90, l. 2.

39.     Hess would then determine the appropriate consultant or engineer to receive the shop drawing and would communicate with and transmit the data, information, and shop drawings to the particular consultant or engineer working on the project.  See Ex. 2 at P. 86, l. 11 – P. 90, l. 2.

40.     Hess coordinated the flow of data, information, and shop drawings between consultants and engineers and contractors.  Ex. 4 at P. 25, l. 24 – P. 26, l. 4 and Ex. 2 at P. 86, l. 11 – P. 90, l. 2.

41.    Plaintiff's primary duty on the University of Arkansas Project is commonly performed by intern architects in the field of architecture.  Ex. 4 at P. 26, ll. 10-25.

## III.  ARGUMENT AND AUTHORITIES

### A.    Standard of Review

Summary judgment is appropriate if the pleadings, discovery materials, and affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  FED.R.CIV.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-323 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *Kendall v. Watkins*, 998 F.2d 848, 850 (10th Cir. 1993).  A material fact is one which may affect the outcome of the suit under governing law.  *Anderson*, 477 U.S. at 323.

Once the moving party has satisfied its burden under Rule 56(c), the opposing party must do more than "show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986) (citations omitted).  No genuine issue for trial exists "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party."  *Id.* at 587.  "The mere existence of a scintilla of evidence in support of plaintiff's position will be insufficient; there must be evidence on which the [trier of fact] could reasonably find for the plaintiff."  *Anderson*, 477 U.S. at 252.

### B.    Plaintiff is not entitled to overtime compensation because he is exempt from Section 207(a) of the FLSA

Plaintiff was employed in a professional capacity.  As such, he is not entitled to overtime wages as a matter of law.  The Fair Labor Standards Act ("FLSA") provides that all employees, ***not otherwise exempt***, are to be paid overtime compensation for all hours worked in excess of 40 per work week.  29 U.S.C. § 207(a).  However, § 207(a) does not apply to an employee "employed in a bona fide . . . professional capacity . . .."  29 U.S.C. § 213(a)(1).  To be so

employed, an employee must be (i) compensated at a salary of not less than $455 per week (ii) whose primary duty is the performance of work "[r]equiring knowledge of an advanced type in a field of science or learning customarily acquired by a prolonged course of specialized intellectual instruction."  29 C.F.R. § 541.300(a).

1.      **Plaintiff was compensated at a salary of not less than $455 per week.**

For the professional exemption to apply, the Department of Labor ("DOL") requires that an employee be compensated at a rate of not less than $455 per week.  Plaintiff was paid a weekly salary of $1,009.62.  Plaintiff meets the first requirement of the professional exemption.

2.      **Plaintiff's primary duty was the performance of work requiring knowledge of an advanced type in a field of science or learning.**

For the professional exemption to apply, an employee must also meet the "primary duty" requirement described above.  The DOL has issued regulations interpreting the "primary duty" requirement.

a.      **Plaintiff worked in a field of science or learning customarily acquired by a prolonged course of specialized intellectual instruction.**

"The phrase 'field of science or learning' includes the traditional professions of . . . architecture."  29 C.F.R. 541.301(c).  "The phrase 'customarily acquired by a prolonged course of specialized intellectual instruction' restricts the exemption to professions where specialized academic training is a standard prerequisite for entrance into the profession.  The best prima facie evidence that an employee meets this requirement is possession of the appropriate academic degree.  However, the word 'customarily' means that the exemption is also available to employees in such professions who have substantially the same knowledge level and perform substantially the same work as the degreed employees, but who attained the advanced knowledge through a combination of work experience and intellectual instruction."  29 C.F.R. § 541.301(d).

The undisputed material facts show that Plaintiff possesses a Bachelor of Architecture degree, received post-graduate education in the field of architecture, and has worked for nearly 20 years as an intern architect and project manager.  Plaintiff has not taken the exams required to be a registered architect.   However, "neither the statutes nor the regulations require that a professional be licensed."  *Tavassol v. Hewitt-Washington & Assocs.*, 1998 WL 751636 at *3 (E.D. La. Oct. 23, 1998).

> **b.      Plaintiff performed work which was predominantly intellectual in character and required the consistent exercise of discretion and judgment.**

"The phrase 'work requiring advanced knowledge' means work which is predominantly intellectual in character, and which includes work requiring the consistent exercise of discretion and judgment, as distinguished from performance of routine mental, manual, mechanical or physical work.  An employee who performs work requiring advanced knowledge generally uses the advanced knowledge to analyze, interpret or make deductions from varying facts or circumstances."  29 C.F.R. § 541.301(b).

Further, the undisputed material facts show that while employed by Defendant, Plaintiff performed work entirely intellectual in character and which required the consistent exercise of discretion and judgment and involved the use of advanced knowledge to analyze and make deductions from varying factual circumstances, rather than routine, manual or mechanical work.

Shortly after being hired, Plaintiff was assigned to be the project manager for the development and construction of a health clinic in Vinita.  Plaintiff performed a number of varied and intellectual duties on the Vinita Project.  Plaintiff worked extensively with structural engineers to ensure the building would be structurally sound.  This included Plaintiff attending numerous meetings and discussions with the structural engineers to discuss the building's design and floor plans and Plaintiff editing and modifying the existing floor plans using architectural

drawing and design software. Plaintiff also received and reviewed the structural engineers' edits and modifications and incorporated those into the building's floor plans. Plaintiff also relayed the Vinita Project's construction schedule to the outside consultants and engineers to ensure timely construction. Plaintiff also edited the floor plans to meet the client's design requirements such as readjusting rooms, changing the size of rooms, altering the height of ceilings, and changing building materials. Plaintiff also edited and corrected the design and floor plans to ensure they complied with building codes. Plaintiff coordinated the installation of medical equipment in the building and ensured the required medical equipment was incorporated into the building design and floor plan. In performing this task, Plaintiff worked with electrical engineers to determine if the required medical equipment would fit with the existing design concept. Plaintiff also coordinated and communicated with civil engineers to ensure the site chosen for the building was suitable and workable.

Similarly, Plaintiff's work on the Tishomingo and Ardmore Projects was also intellectual in character and required the exercise of discretion and judgment and the use of advanced knowledge. Plaintiff's primary duty on the Tishomingo Project was coordinating the installation of medical equipment requested by the client to be installed in the building and ensuring that the required medical equipment was incorporated into the building design and floor plan. Plaintiff edited the existing floor plan to accommodate the requested medical equipment. And communicated with product manufacturers to determine and obtain detailed technical information regarding particular medical equipment. After obtaining the requested information, Plaintiff communicated with electrical engineers regarding the location of the medical equipment and the design of electrical panels to accommodate the equipment. On the Ardmore Project, Plaintiff, using Revit and/or AutoCAD architectural design software, modified and edited the

existing floor plans and was responsible for adding detail, such as window details, to sections of the floor plans.  Plaintiff also met with the client for equipment planning purposes to discuss the types of medical equipment that the clinic would need to accommodate.

In *Tavassol*, the court held that a nonregistered architect was exempt under the professional exemption.  *3.  The court determined that the plaintiff exercised the "requisite discretion and judgment" in producing and editing architectural drawings using AutoCAD software.  *3.  The court further stated the plaintiff's production and editing of architectural drawing using AutoCAD "was predominately intellectual and varied in nature for purposes of the third factor" and that "[t]he end result of the CAD process was the equivalent of architect's drawings, which clearly meets the standard set forth in this factor."  *3.  *Tavassol*'s factual scenario is apposite to the case at hand.  In *Tavassol*, the plaintiff possessed a degree in architecture, but had not passed the exams required to be a registered architect.  *1.  The plaintiff was hired to be a production/project architect, was paid a set weekly salary, and on two or three occasions received extra pay loosely referred to as "overtime."  *2.  The plaintiff testified that a majority of his work was the production and editing of architectural drawings.  Id.

Based upon the regulations as well as the *Tavassol* guidance, this Court should hold that Plaintiff was as exempt employee as a matter of law.

## C.     Plaintiff is not entitled to liquidated damages

Assuming, *arguendo*, Plaintiff does not meet the professional exemption, Plaintiff is not entitled to liquidated damages.  "An employer who violates the FLSA shall be liable to the employee for overtime compensation and an additional equal amount as liquidated damages." *Renfro v. City of Emporia, Kan.*, 948 F.2d 1529, 1540 (10th Cir. 1991) (citing 29 U.S.C. § 216(b)).  "The purpose for the award for liquidated damages is the reality that the retention of a workman's pay may well result in damages too obscure and difficult of proof for estimate other

than by liquidated damages." Id. (internal citations omitted). However, if "an employer shows to the satisfaction of the court that the act or omission giving rise to such action was in good faith and that he had reasonable grounds for believing that his act or omission was not a violation of the FLSA, the court may refuse to award liquidated damages." Id. (citing 29 U.S.C. § 260).

"The good faith requirement mandates the employer have an honest intention to ascertain and follow the dictates of the Act." Id. "The additional requirement that the employer have reasonable grounds for believing that his conduct complies with the Act imposes an objective standard by which to judge the employer's behavior." Id.; see also Mumby v. Pure Energy Servs. (USA), Inc., 636 F.3d 1266, 1272 (10th Cir. 2011) ("While the reasonableness requirement is an objective standard, the good-faith inquiry is subjective, requiring an "honest intention to ascertain and follow the dictates" of the FLSA.").

Defendant subjectively and in good faith believed it was not required to pay Plaintiff overtime. Furthermore, Defendant had reasonable grounds for believing its failure to pay overtime was not a violation of the FLSA. As discussed above, Plaintiff possesses an architectural degree and has worked as an intern architect for nearly 20 years. It is reasonable to believe that a person with the Plaintiff's education background and experience would not be entitled to overtime compensation.

## IV.  CONCLUSION

WHEREFORE, based on the above and foregoing, Defendant James R. Childers Architect, Inc. respectfully requests that the Court grant it summary judgment as to each and every legal theory raised herein, that it be awarded its fees and costs associated with this action, and that it may be awarded any and all other legal or equitable relief to which it may be entitled.

Respectfully submitted,

DOERNER,  SAUNDERS,  DANIEL
& ANDERSON, L.L.P.

By: s/Kenneth T. Short
      Kristen L. Brightmire, OBA No. 14239
      Kenneth T. Short, OBA No. 22712
      Two West Second Street, Suite 700
      Tulsa, Oklahoma 74103-3117
      Telephone (918) 582-1211
      Facsimile (918) 591-5360
      kbrightmire@dsda.com
      kshort@dsda.com

      Attorneys for Defendant

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on the 10th day of October, 2012, he caused a true and correct copy of the above and foregoing **Defendant's Motion for Summary Judgment and Brief in Support** to be transmitted to the Clerk of Court using the ECF System for filing and causing the transmittal of a Notice of Electronic Filing to the following ECF registrants:

Steven R. Hickman: frasier@tulsa.com

s/ Kenneth T. Short
Kenneth T. Short

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF OKLAHOMA

THOMAS J. HESS, JR.,          )
                                  )
          Plaintiff,        )
v.                             )
                                  )  Case No. 11-CV-482-GKF-FHM
JAMES R. CHILDERS, ARCHITECT, INC., a )
corporation,                   )
                                  )
          Defendant.     )

**AFFIDAVIT OF JAMES R. CHILDERS**

STATE OF ARKANSAS      )
                           )  ss.
COUNTY OF SEBASTIAN     )

I, James R. Childers, of Fort Smith, Arkansas, being first duly sworn on oath, depose and state that:

My name is James R. Childers and I am a licensed architect in the states of Arkansas and Oklahoma and the sole shareholder of Defendant James R. Childers, Architect, Inc. The facts set forth in this Affidavit are made upon my personal knowledge, and I am able to testify competently to the facts set forth in this Affidavit. I give this Affidavit in support of the Motion for Summary Judgment to be filed on behalf of Defendant James R. Childers, Architect, Inc. in the above styled and captioned lawsuit.

Defendant is an architectural firm with offices located in Fort Smith, Arkansas and Tahlequah, Oklahoma.

Plaintiff Thomas J. Hess, Jr. was hired by Defendant on July 9, 2010 as a nonregistered "intern" architect and project manager.

Nonregistered architects are persons who have received a degree in architecture and work as architects, but have not passed the exams required to be a licensed architect. Nonregistered architects are commonly referred to as "intern" architects.

Plaintiff was hired to be the project manager for the construction of a health clinic for the Cherokee Nation in Vinita, Oklahoma.

As project manager, Plaintiff was responsible for overseeing the development and construction of the health clinic and ensuring the completion of a number of tasks during development and construction.

Plaintiff was hired, in part, due to his extensive experience as an intern architect and project manager and his experience in developing and working on medical clinics and hospitals.

Plaintiff's weekly salary while employed by Defendant was $1,009.61 per week.

Defendant subjectively believed that Plaintiff was not entitled to overtime compensation.

Plaintiff was laid off by Defendant on June 10, 2011 for lack of work.

Subscribed and sworn to before me this ___oth___ day of October, 2012.

_James R. Childers_

Notary Public _____

Commission Number _____

My Commission Expires: _____

**Exhibit 1**

1

IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OKLAHOMA


TOM HESS,                        )
                                 )
             Plaintiff,          )
                                 )
      -vs-                       )Case No. 11-CV-482-GKF-FHM
                                 )
JAMES R. CHILDERS                )
ARCHITECT, INC., a               )
corporation                      )
                                 )
             Defendant.          )
                                 )

*   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *


*DEPOSITION OF THOMAS HESS*

TAKEN ON BEHALF OF THE DEFENDANT

TAKEN AT 2 WEST 2ND STREET

TULSA, OKLAHOMA

SEPTEMBER 18, 2012


*   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *


BALLARD REPORTING
611 WEST 15TH STREET, C-3
TULSA, OKLAHOMA  74127
(918) 949-3811


*   *   *   *   *   *   *   *


REPORTED BY:  MILLIE BALLARD, CSR

EXHIBIT
2

A P P E A R A N C E S


FOR THE PLAINTIFF:        FRANK W. FRASIER
                          FRASIER, FRASIER & HICKMAN
                          1700 Southwest Boulevard
                          Tulsa, Oklahoma 74107


FOR THE DEFENDANT:        KENNETH T. SHORT
                          DOERNER, SAUNDERS, DANIEL &
                          ANDERSON
                          2 West 2nd Street
                          Suite 700
                          Tulsa, Oklahoma 74103



            *    *    *    *    *    *    *    *



            S T I P U L A T I O N S


        It is hereby stipulated and agreed by and

between the parties hereto, that this deposition is

being taken pursuant to agreement and that the same may

be taken at this time and place.

        It is further stipulated and agreed that all

objections are reserved to the time of trial, except as

to form, with the same force and effect as if made at

the taking of the deposition.

1   A.  In, I believe, '86.

2   Q.  You mentioned OU.  Did you go to OU after

3       graduating high school?

4   A.  That's correct.

5   Q.  Did you graduate from OU?

6   A.  That's correct.

7   Q.  What kind of degree did you graduate with?

8   A.  It's a Bachelor's of Architecture.

9   Q.  Do you recall what year you graduated with that

10      degree?

11   A.  Yes.  I believe it's '94, 1994.

12   Q.  You state that you graduated high school in 1986;

13      is that correct?

14   A.  That's correct.

15   Q.  And you received a Bachelor of Architecture degree

16      in 1994; is that correct?

17   A.  That's correct.

18   Q.  Is that typically an eight-year program?

19   A.  No.  If I can elaborate on what had happened.

20   Q.  Please do.

21   A.  One instance is my advisor had informed me to take

22      one class, and, if you know, you have to take

23      certain classes in a timely manner and I had

24      realized it by one day too late, so that made me

25      stay there an extra two years because of that one

1      class.  My advisor was supposed to know what to do

2      and she did not inform me.

3  Q.  Well, that's a little bit of a problem, I guess.

4  A.  Yes.

5  Q.  So the Bachelor's of Architecture degree you

6      received in 1994, did you do any post graduate

7      studies?

8  A.  Yes, I did some graduate work, because I was

9      required to take 12 hours per semester or I would

10     have to start paying my student loans.  You know, I

11     had done, you know, some higher level classes

12     because I just had to take them.  There was nothing

13     else I could take that would be meaningful.

14 Q.  So when did you take these classes?

15 A.  I need to -- when you say post graduate, you mean

16     like for a master's?

17 Q.  Let me clarify that.  At any point after receiving

18     your bachelor's degree, did you pursue a master's

19     degree or any other post-graduate degree, a Ph.D. or

20     anything like that?

21 A.  Yes.  I was enrolled in a master's program at the

22     University of, I guess, Oklahoma-Tulsa, just kind of

23     out there, (indicating).  It was like a -- I don't

24     remember the exact name of the program, but it was

25     like an urban Master's of Architecture.

1     Tulsa, plus other projects that they were trying to

2     get but didn't get, you know, just kind of

3     presentation drawings.

4  Q.  Now, we talked about your Bachelor's of

5     Architecture degree and the Master's of Architecture

6     that you pursued.  After you completed your

7     education, what was your understanding of your job

8     title at that time?

9  A.  I don't recall exactly at the time that I completed

10    my -- or didn't complete my -- well, let me ask a

11    question:  Are you talking about my Bachelor's of

12    Architecture or are you talking about my post --

13  Q.  Well, let me ask this question.  I think I can ask

14    this a little better.  It is my understanding that

15    there are basically two levels of architects.  There

16    is an intern architect and a licensed architect.

17    Would that also be your understanding?

18  A.  I believe so.

19  Q.  What is your understanding of the difference

20    between an intern architect and a licensed

21    architect?

22  A.  An architect can practice architecture; an intern

23    architect cannot.

24  Q.  When you say practice architecture, what do you

25    mean by that?

| | |
|---|---|
| 1 | A. That means that you can design and stamp drawings. |
| 2 | Q. As far as you know, can an intern architect |
| 3 | represent himself to the public as an architect? |
| 4 | A. No, that's not -- you should never do that. |
| 5 | Occasionally -- I mean you should never do that. |
| 6 | That's something that's not right. |
| 7 | Q. As far as you know, can an intern architect put an |
| 8 | ad in the phone book or put up a sign saying that |
| 9 | he's an architect? |
| 10 | A. No. |
| 11 | Q. What is your understanding of the process of how an |
| 12 | intern architect becomes a licensed architect? |
| 13 | A. Well, one way of becoming a licensed architect is |
| 14 | you have to work under a licensed architect -- you |
| 15 | have to work under the tutelage of a licensed |
| 16 | architect. |
| 17 | Once you've done that for a certain period, |
| 18 | you can sit for your tests -- or you have to do |
| 19 | NCARB, National Council of Registration |
| 20 | Architectural Board.  Once they give you approval, |
| 21 | then you can send it to the State and the State says |
| 22 | that you can sit for your tests.  Them being -- at |
| 23 | one time it was nine, but I think now it's seven |
| 24 | tests, and they all have different areas of |
| 25 | expertise that you were supposed to learn in -- |

1              (Cell phone interruption.)

2   A.   Sorry.  I thought I had turned this off.

3        -- under those areas and then you can take the

4        test.  If you pass all those tests that are

5        administered by the State, then you can supposedly

6        be a licensed architect and practice architecture in

7        that state.

8   Q.   (By Mr. Short)  Why do you say supposedly?

9   A.   Well, there might be something that's -- that you

10       can't do it for -- they don't approve you testing

11       or -- I don't really know.  I just know that nothing

12       is for sure in this world.

13  Q.   I believe you said that is one way.  Do you know of

14       any other way that an intern architect can become a

15       licensed architect?

16  A.   Well, I don't think -- yes, there used to be

17       another way, you could work under an architect for

18       12 or more years and then you would be allowed to

19       sit for your test, but I don't think you can do that

20       in the state of Oklahoma anymore.

21  Q.   Are you in the process or have you been in the

22       process of becoming a licensed architect?

23  A.   No.

24  Q.   Is there any particular reason why that's the case?

25  A.   Time, work, and money.

1    Q.   Have you set for any of the exams yet?

2    A.   No, sir.

3    Q.   You mentioned submitting hours to an organization

4         called NCARB.  Have you done that yet?

5    A.   No, sir.

6    Q.   Do you have any intention of becoming a licensed

7         architect at any point?

8    A.   Yes, I have an intention to become a licensed

9         architect.

10   Q.   Now, you mentioned time and money as a couple

11        reasons why you have not gone down the path of

12        becoming a licensed architect yet.  I assume it

13        costs some money to take these tests and to submit

14        these applications; is that true?

15   A.   Yes.

16   Q.   And you mentioned time.  Is there a particular time

17        constraint that this involves?

18   A.   Well, it's the time to fill the paperwork out and

19        also the time to test, but that usually gets in the

20        way of the work that you're doing at firms or other

21        places that you work at.

22   Q.   So I take it if you're working at an architectural

23        firm, they have the expectation that the firm work

24        comes first and then secondarily is your attempt to

25        become a licensed architect.

```
1   Q.   It says there -- a box is checked that states pay
2        frequency, and the weekly box is checked.  Were you,
3        in fact, paid weekly by Childers?
4   A.   Yes.
5   Q.   Now, I asked you and you stated that it was your
6        understanding that you were hired as an intern
7        architect.  Do you recall the interview process with
8        Childers at all?
9   A.   Yes, I do.
10  Q.   Do you recall who you interviewed with?
11  A.   Yes.
12  Q.   Who was that?
13  A.   That was Breck Childers, or John Breck Childers,
14       Casey Hargrave, and Shane Moore.
15  Q.   How did the process get started?  I assume at some
16       point you submitted your resumé; is that correct?
17  A.   Yes, I showed my resumé.
18  Q.   Then what happened after that?
19  A.   They looked at it and they asked me specific
20       questions.  I don't recall those questions, but --
21       and then they wanted to look at my portfolio and
22       they all passed it around to look at it.
23  Q.   I'm assuming at some point you went down to Fort
24       Smith for an interview; is that correct?
25  A.   That's the time I was speaking of is when I went
```

```
 1        for the first interview in Fort Smith, Arkansas.
 2   Q.   So when you were initially hired, were you
 3        initially hired to work in the Fort Smith office?
 4   A.   That's correct.
 5   Q.   And at the time, were you living in Fort Smith?
 6   A.   Yes.  I wasn't living there at the time that they
 7        hired me.  I had rented an apartment after they
 8        hired me.
 9   Q.   So when you applied for the job, where were you
10        living?
11   A.   I was living in Tulsa.
12   Q.   And then at some point, you got the job and then
13        you get an apartment down in Fort Smith; is that
14        correct?
15   A.   No.
16   Q.   Then what happened?
17   A.   I rented an apartment in Oklahoma, just like right
18        across the border from Arkansas.
19   Q.   And I'm assuming you did that so you didn't have to
20        make the two-hour commute from Tulsa; correct?
21   A.   That's correct.
22   Q.   When you were hired, was it your understanding that
23        you would ever serve in a project manager or a team
24        leader type of role?
25   A.   I assumed so.
```

1  Q.  Why did you assume that?

2  A.  When Casey Hargrave had offered the position, he

3      said I would act in the capacity of project

4      manager/production/intern architect, and, of course,

5      I don't -- you know, I was just happy to have a job,

6      so it didn't really matter at the time.

7  Q.  Did you understand that to be three distinct but

8      related positions, product manager/production/intern

9      architect?

10 A.  Can you please repeat the question?

11 Q.  Yeah.  You stated that you were told that you would

12     be project manager/production/intern architect.  I

13     take it that's three different types of duties or

14     three different positions; is that correct?

15 A.  I believe so.

16 Q.  What was your understanding when you were hired of

17     what your duties would be as an intern architect?

18 A.  I didn't know, to be frank, because every place

19     I've worked at it different.

20 Q.  Did you have any understanding of what your duties

21     would be as a project manager?

22 A.  No.

23 Q.  Did you have any understanding of what your duties

24     would be as production?

25 A.  I would assume it would entail some drafting, but,

1    you know, that varies.

2  Q.  Now, when you were hired by Childers, was it your

3      understanding that you were hired to work on a

4      specific project?

5  A.  I believe so.

6  Q.  Do you recall what that project was?

7  A.  It was the Cherokee Indian health clinic in Vinita.

8  Q.  So was that the first project that you worked on at

9      Childers?

10 A.  I believe so.

11 Q.  Were you the project manager on that project?

12 A.  I thought I was, but it became pretty apparent that

13     I wasn't going to be.

14 Q.  Do you recall representing yourself as the project

15     manager on that project?

16 A.  Yes.

17                  (Exhibit 3 marked.)

18 Q.  (By Mr. Short)  Mr. Hess, let me hand you what I'll

19     mark as Exhibit 3 to your deposition.  Do you recall

20     having seen that e-mail before?

21 A.  Yes, I do.

22 Q.  And is this an e-mail that you sent?

23 A.  Yes, it is.

24 Q.  Okay.

25 A.  I don't know who Mark Moll is, but -- do you?

1  Q.  I will represent to you that Mark Moll is an

2      attorney who forwarded this e-mail on to me.

3  A.  Okay.

4  Q.  Let me read a line from this e-mail where you

5      state, "I want to introduce myself since I will be

6      the project architect/project manager working on

7      this project."

8  A.  Uh-huh.

9  Q.  I take it you sent this e-mail shortly after

10     working on the project; is that correct?

11 A.  Yes.

12 Q.  I should say shortly after beginning work on the

13     project; is that correct?

14 A.  That's correct.

15 Q.  In your role as project manager on this medical

16     clinic in Vinita, what were your duties?

17 A.  Well, I hate to be indignant, but I wasn't actually

18     project manager at the time.  You know, I stated it

19     in this letter, but what I consider a project

20     manager, I was not a project manager.

21 Q.  So despite the fact that you stated in this e-mail

22     that you were project architect/project manager, you

23     actually did not feel at the time that you were the

24     project architect/project manager.

25 A.  That's correct.  Yes.

```
 1  Q.  Would you mind taking a look at the "to" line on
 2      this e-mail.  Who is Bruce Roberson?
 3  A.  Bruce Roberson, I believe that he's a president of
 4      Foy Consulting.
 5  Q.  Do you recall what Foy Consulting does?
 6  A.  Yes.
 7  Q.  What is that?
 8  A.  They're a structural engineer consulting firm.
 9  Q.  Do you recall who Ryan Ray is?
10  A.  Yes, I do.
11  Q.  Who is that?
12  A.  He's an engineer of -- I don't know what his
13      background is, but he's an engineer that works for
14      Harrison French & Associates.
15  Q.  Do you recall who David Thomas is?
16  A.  Yes.
17  Q.  And who is he?
18  A.  He's another engineer that works for Harrison
19      French.
20  Q.  What about Scott Howard?
21  A.  I don't recall who he is.  I don't even remember
22      the -- was it -- maybe he was the landscape.  I'm
23      not sure of the acronym.  I don't recall who --
24  Q.  So you sent this e-mail to a number of people, a
25      couple of which are engineers, and I take it all of
```

1       them are consultants on this project; is that

2       correct?

3  A.  That's correct, consultants to Childers.

4  Q.  what is the purpose of this e-mail?

5  A.  ·It was to introduce myself.

6  Q.  why were you introducing yourself?

7  A.  Because I started working at the company and I was

8       going to be helping, helping with the project.

9  Q.  Is there any reason that you would introduce

10      yourself to consultants and engineers as a project

11      manager on a project if you were not, in fact, the

12      project manager on that project?

13 A.  NO.

14 Q.  In this e-mail, you state that Childers Architect

15      has gotten approval for the Vinita floor plans and a

16      3-D concept and that you need to proceed on to the

17      next stage.  Explain to me what the floor plans and

18      3-D concept are.

19 A.  Floor plans were, I guess, approved floor plans

20      that someone in the office had gotten approval from

21      the client on what they were wanting, and then the

22      3-D is the 3-D model of the physical building at the

23      time of this e-mail.

24 Q.  Did you work on either the floor plans or the 3-D

25      concept?

1   A.   I worked on both of them.

2   Q.   Let's talk about the floor plans.  What do you

3        recall doing on these floor plans?

4   A.   I don't recall everything, but I know that,

5        initially, the first thing I was trying to get in

6        order was the structure.  The structure was kind of

7        helter-skelter everywhere.

8   Q.   What do you mean by "structure"?

9   A.   Column grids, you know, things that hold the

10       building up.

11  Q.   So the actual structure of the building on the

12       floor plans was not correct?

13  A.   No.

14  Q.   So I take it you corrected those errors?

15  A.   I tried.

16  Q.   When you say that you tried to correct the errors,

17       what did you do to try to correct the errors?

18  A.   I wasn't -- retract.  It's not correcting the

19       errors.  The structure was not working with what I

20       was told that was supposed to happen in certain

21       areas of the building.

22  Q.   Well, what do you mean by that?  Do you mean that

23       the drawings were flawed and that it was

24       structurally unsound or that it was not what the

25       client desired?  Explain to me what you mean by

1      that.

2  A.  From my recollection, the structure was just kind

3      of pushed everywhere from the process before I got

4      there and it wasn't really organized.  It didn't

5      have gridlines, per se, and didn't tie in with, I

6      guess, the concept.

7  Q.  So what exactly did you do to correct that?  Did

8      you redo the drawings?

9  A.  No, I spoke with the structural engineers to try to

10     figure out what their intent was to make the

11     building stand up.

12 Q.  So you discussed this issue with structural

13     engineers who were working on the project?

14 A.  That is correct, yes.  And it wasn't -- it was

15     initially with Bruce Roberson, but there's another

16     one that's not listed on here that was basically the

17     one I worked with.  I can't remember his name right

18     now, but he works at Foy.

19 Q.  What did you find out from the structural

20     engineers?

21 A.  They were concerned about a lot of issues on how to

22     make the building stand up, so we proceeded with

23     meetings with Breck and a couple of other people to

24     try to figure out how to get what he wanted and what

25     the structure looked like to make it work.

1   Q.   So you and Breck met with structural engineers

2        regarding the structure of the building; correct?

3   A.   That's correct.

4   Q.   What did you talk about in those meetings?

5   A.   The structural engineer was concerned about

6        X-bracing and the main spine down the building, so

7        we met with him to try to figure out how to do that

8        and with what Breck wanted it to look like.

9   Q.   At some point, did you come up with a solution,

10       together with the structural engineers, to fix this

11       problem?

12  A.   No.

13  Q.   How did the project proceed without a solution to

14       this particular problem?

15  A.   I was taken off the project and put on another one.

16  Q.   Let me go back then.  You stated that you met with

17       the structural engineers to discuss this problem.

18       Do you recall how many times you met with them?

19  A.   Not exactly, but I would conjecture four or five

20       times, you know, versus a Smartboard or by phone.

21       It might have been considerably more.  I don't

22       recall the exact number.

23  Q.   So you guys were never all in the room at the same

24       time?

25  A.   Sometimes when we had the -- yeah, no, we weren't

```
1        ever in the room at the same time as -- by, you
2        know, over the phone, by -- I forgot the program you
3        use so you can coordinate the computer to show what
4        areas you're talking about.
5   Q.   But you did it through video conferencing or audio
6        conferencing?
7   A.   Yes, video conferencing would be the appropriate
8        term.
9   Q.   So you would have discussions with these structural
10       engineers trying to figure out ways to make this
11       structure sound; is that correct?
12  A.   That's correct.
13  Q.   What kind of work did you do on the 3-D concept?
14  A.   Not much.  I didn't do any designing, per se, with
15       the concept.
16  Q.   Well, when you say "not much," do you recall
17       exactly what you did?
18  A.   Not exactly.  Most of the things I was doing
19       initially was trying to make sense of what was
20       there, you know, getting familiar with the project
21       and also meeting with the structural -- to see what
22       they were approaching, because I didn't know how far
23       along they were in supplying us document for the
24       structures for the building.
25  Q.   In the e-mail, you stated that Childers has gotten
```

1    approval for the Vinita floor plans and 3-D concept,

2    and then you state, "So we need to proceed to the

3    next stage."  What was the next stage with the

4    project?

5  A.  Well, move further down to getting construction

6    documents done.

7  Q.  What do you mean when you say "move further down to

8    getting construction documents done"?

9  A.  Well, there's different stages in the project.

10    It's schematic design, design development,

11    construction documents, and then bidding and then

12    you build it or the contractor builds it.

13  Q.  Okay.

14  A.  So I believe we were at schematic -- DD and they

15    were moving into construction documents.  But I

16    might be incorrect, because I don't remember exactly

17    what -- because it was way, way behind in my

18    opinion.  We had some major issues with the

19    structure, you know, with what Breck wanted and what

20    reality was on how to make the building stand up, so

21    I was kind of flabbergasted about some things that

22    he wanted.  So were the engineers, but he was --

23    it's a job.

24  Q.  Well, what did you do to move the project along to

25    the next stage, to the construction document stage?

1    A.   Well, we -- I consulted with other people that were

2         familiar with the project, specifically Breck, in

3         meeting the requirements of each of the rooms, so

4         readjusted the rooms to meet the design requirements

5         of the clients.  And they were meeting with the

6         clients and giving me that information to try to

7         change the plans.

8    Q.   So when you say that you were readjusting the rooms

9         or changing the plans, what do you mean by that?

10   A.   Changing the size.

11   Q.   What exactly were you doing?

12   A.   Changing the size; one example, height of the

13        ceiling, material, et cetera.

14   Q.   And when you say you were changing the height of

15        the ceiling, is that on a drawing?  On a detail?

16        How do you do that?

17   A.   It would either be in the BIM model, Revit, or in

18        CAD, which is AutoCAD.  It was specifically in

19        Revit, because you can adjust the ceiling heights,

20        because it's a representation of a 3-D building.

21   Q.   Explain to me how you would get into the software

22        and what you would do to change a room.

23   A.   Well, you would open the program first and then you

24        would click on the file that would be the project

25        and then you would go to a particular view and

```
 1        adjust it using the program to either change the
 2        height of the ceiling by typing in a number or
 3        physically moving it with the mouse on the screen to
 4        pull it up to a certain height.
 5    Q.  So by doing that, would you be changing the drawing
 6        of the building, the detail of the building?
 7    A.  Yes, you would be changing it.
 8    Q.  Again, what was the reason why you would need to do
 9        that, to change these rooms?
10    A.  They had -- I don't know, pure conjecture on my
11        part, because I don't remember, but it was a
12        requirement of the structural engineer.  The beam
13        was in the way or they had some other equipment that
14        wouldn't fit in the room.  This is all just pure
15        conjecture, but that's kind of an example of what
16        can happen in the process.
17    Q.  So was it pretty typical in the process of a
18        construction project that you would need to go back
19        and get on AutoCAD or get on Revit and make changes
20        to the initial drawing or design?
21    A.  Yes, sir.
22    Q.  And you, in fact, did that on this project in
23        Vinita; correct?
24    A.  That's correct.
25    Q.  Did you do that on other projects at Childers?
```

1    A.   Yes.

2    Q.   Is that something that's pretty standard that an

3         intern architect does?

4    A.   Yes.

5    Q.   Now, you stated you met with the structural

6         engineers to discuss the structure of the building.

7         After those meetings, did you go back and get on

8         AutoCAD or get on Revit and make changes to the

9         design?

10   A.   No.  Usually, the structural engineer would send us

11        their file of a structure and then you would import

12        it and then you would have to make changes per their

13        instructions to make sure the walls didn't intersect

14        their structure.

15   Q.   After you received the file from the structural

16        engineer with his changes, what would you do?

17   A.   Usually, you insert it into the BIM model or attach

18        it.

19   Q.   So in this case, the structural engineer has made

20        some changes and sent you a file back?

21   A.   That's correct.  They change the size of beams.

22        It's a lot more complicated than what I'm telling

23        you.  I mean, I'm kind of laughing when you're

24        asking these questions, but --

25   Q.   No, I understand.  I'm trying to make it as simple

1    as possible so I can understand it.

2  A.  It's a lot more complicated.

3  Q.  I understand.

4       So after the structural engineers in this case

5    sent you the file, the changes to the beam size, you

6    would then make changes to the design?

7  A.  Maybe so, if that beam wasn't too deep to intersect

8    with something that would cause a problem with

9    another system of the building.

10 Q.  So if you received the file back from the

11   structural engineers and it indicated that they

12   needed to make a change in the beam size, would you

13   then look to see if that affected the rest of the

14   design or whether or not you needed to make changes?

15 A.  Well, you can hit a button in – it's very simple –

16   in Revit and it detects for conflicts between

17   elements.

18 Q.  Do you recall if there were any conflicts on this

19   project after the structural engineer sent you the

20   file back?

21 A.  Yes.

22 Q.  What did you do after determining there was

23   conflicts?

24 A.  We usually try to set up a meeting to resolve those

25   with Breck and, you know, what he wanted.

1            And specifically, it was X-bracing in the

2       ceiling, because that was a major issue in terms of

3       how to make a building stand up.

4    Q.  So did you notice the conflict with the X-bracing

5       in the ceiling?

6    A.  No, the engineers pointed it out to me.

7    Q.  After they pointed it out to you, did you notice

8       that it created a conflict with the rest of the

9       design?

10   A.  No.

11   Q.  At the bottom of this e-mail here, it states that

12      the next project schedule goal as of July 15, 2010:

13      "Design development (final review) will be due in

14      our office on or before August 11, 2010."

15   A.  Uh-huh.

16   Q.  What does that mean there?

17   A.  That's the schedule that was given to me by meeting

18      with other people in the office of what the clients

19      had required, so I was just regurgitating that

20      information that was told to me.

21   Q.  So you were relaying the schedule to the outside

22      consultants and outside engineers?

23   A.  That's correct.

24   Q.  I believe you stated earlier that, in your opinion,

25      at some point, you were no longer the project

1       manager on this particular project.

2  A.   Yes.

3  Q.   Is that correct?

4  A.   Yes.

5  Q.   Why do you believe you were no longer the project

6       manager?

7  A.   I was told I wasn't.

8  Q.   Do you recall when you were told that?

9  A.   Not an exact time.

10 Q.   Do you recall who told you that?

11 A.   Casey or Casey Hargrave.

12 Q.   Did she tell you why you were no longer --

13 A.   That's a man.

14 Q.   Sorry.  Did he tell you why you were no longer the

15      project manager?

16 A.   Breck had gotten sick and they were taking over the

17      office.

18 Q.   Who is "they"?

19 A.   That would be Casey and Jennifer.

20 Q.   Okay.

21 A.   And Rhett.  Rhett, too, was going to be.

22 Q.   So Breck was sick, so a couple of other people were

23      taking over leading the project; is that correct?

24 A.   That's correct.

25 Q.   Were you still working on the project?

1    A.   I believe, at that time, I was.

2    Q.   What were you doing on the project at the time?

3    A.   I was just being -- I was doing what I was told to

4         do.

5    Q.   Do you recall what that is?

6    A.   Making changes to the floor plan, I believe.

7    Q.   So how would you make changes to the floor plan?

8    A.   I would use their Revit model, the Revit program to

9         make changes.

10   Q.   So were you told by Casey or --

11             I'm sorry, was it Rhett?

12   A.   Yeah, I believe it's Rhett.

13   Q.   So were you told by Casey or Rhett that changes

14        needed to be made to the floor plan?

15   A.   No, I was told by Jennifer Caperton.  She was

16        basically in charge of it and all that was relayed

17        through Casey.

18   Q.   So would Jennifer tell Casey to tell you to make

19        changes to the floor plan?

20   A.   I don't know.

21   Q.   But it was your understanding that, at various

22        times, you needed to make changes to the floor plan;

23        is that correct?

24   A.   Yes.

25   Q.   What would you do after you made the changes to the

1      floor plan?

2  A.  Go home.  I'm sorry.  I don't know.

3  Q.  Well, I mean I'm assuming this is a collaborative

4      effort that you've passed it off to somebody else

5      for review; is that correct?

6  A.  Yeah.  I mean after I made changes, I'd, you know,

7      show it to someone in the office.

8  Q.  After they reviewed the work, do you recall who

9      they would be, who reviewed the work?

10 A.  Mainly Jennifer.  I mean I relied on a couple of

11     people in the office, because they were familiar

12     with the way things worked.  A couple of people that

13     might have instructed me would be Tyler, because he

14     was familiar with the way that the office liked

15     things, and specifically, he was talking about

16     Jennifer Caperton's way.

17 Q.  Okay.

18 A.  And then John Lane was another architect in the

19     office.  He would instruct us for code issues on the

20     project.  He would mark up the sheets and say issues

21     of firewalls, you know, where they needed to be

22     located, things of that nature that a license

23     architect would be doing, research on code analysis.

24 Q.  So for example, if a change needed to be made to

25     ensure that the floor plan complied with building

```
 1        codes, the floor plan would be given back to you and
 2        you would make sure those changes were made; is that
 3        safe to say?
 4    A.  Yes.  They would be specifically given to John and
 5        then John would mark them up and then you would have
 6        to make changes to his review of the code.
 7    Q.  At any point, did you send these changed floor
 8        plans to the consultant, to the engineers, or
 9        anybody else?
10    A.  Yes.
11    Q.  Who do you recall sending them to?
12    A.  Probably all the people listed on this e-mail.
13    Q.  Why would you send your floor plan changes to the
14        consultants or engineers?
15    A.  Well, they had to do their job to update things.
16        We usually would send a base file, which is the
17        central file, and they would work off of that and
18        then send their part back to us.
19    Q.  Okay.
20    A.  I can't imagine you trying to understand.
21    Q.  So they would review the floor plans and then send
22        it back to you?
23    A.  They'd send the -- you mean the engineers?
24    Q.  Yes, "they" being the engineers.  I'm sorry.
25    A.  They would send their structure, their physical 3-D
```

1    model of the structure back to us in BIM or Revit

2    and we would insert that into the central file, the

3    file we kept, you know, for the whole building.

4 Q.   So when they send that back to you and you inserted

5    it along with everything else, would you then look

6    at it and ensure that everything meshed and

7    coexisted well and determined that there weren't any

8    conflicts?

9 A.   Well, usually we would know of the conflicts

10    before, because either someone would tell me or I

11    would see it or that it was sticking through a wall

12    or something of that nature, that we'd see a

13    conflict.

14 Q.   Is there any other work that you performed on the

15    Vinita project?

16 A.   On the --

17 Q.   The Cherokee medical clinic in Vinita.

18 A.   I don't know if -- what nature are you talking

19    about?

20 Q.   Well, we talked about the start, you were a project

21    manager and you worked a little bit on the floor

22    plans and the concept and then you mentioned making

23    changes and edits to the floor plan.  What else did

24    you do on the project?

25 A.   Well, it was lots of things and those entail

```
 1        numerous items that are usually typically required
 2        on an architectural project.
 3   Q.   For example?
 4   A.   Well, one thing that I remember vividly is there
 5        was a lot of medical equipment and we didn't have
 6        that information, so there was no way to coordinate
 7        it until very, very, very late in the project, which
 8        kind of scared me, because that can get rather
 9        expensive.
10   Q.   What do you mean "coordinate it"?
11   A.   The medical equipment is inherently complicated.
12        The engineers need time to do their job to
13        coordinate with the electrical and stuff like that,
14        so they wouldn't be able to get their job done in a
15        timely manner with the schedule that I was told that
16        we had to get it done.
17   Q.   So you're trying to figure out -- you and the
18        engineers are trying to figure out a way to get this
19        medical equipment into the room; is that safe to
20        say?
21   A.   To make it work.
22   Q.   Right.  What did you do to determine that sort of
23        information to be able to solve those problems?
24   A.   I didn't.  Never received it.
25   Q.   Okay.
```

1    A.   From my recollection, until I was moved to another
2         project.
3    Q.   What else did you do on this project besides that?
4    A.   We had looked at how the site worked per the civil
5         engineer, because they were doing some pre-work to
6         get access to the site for utilities and stuff.
7    Q.   What exactly did that entail?
8    A.   To coordinate with the engineers.
9    Q.   Well, what exactly did you coordinate with the
10        civil engineers regarding this site?
11   A.   To see if they could make it work.
12   Q.   So you had discussion with the civil engineers to
13        determine if the site was workable?
14   A.   Yes.
15   Q.   You previously stated that in your previous
16        employment that sometimes you would go out to a site
17        and review concrete pours.  Did you do anything of
18        that nature on this particular project?
19   A.   No.
20   Q.   You mentioned other projects.  What other projects
21        did you work on at Childers?
22   A.   Tishomingo clinic for the Chickasaw Nation.
23   Q.   Do you recall where that clinic was?
24   A.   I believe it was in Tishomingo -- or I don't recall
25        the -- I believe that was the location.

```
1    Q.   What type of project was that?
2    A.   It was very similar to the Vinita project.
3    Q.   Were you the project manager on that project?
4    A.   No.
5    Q.   Were you an intern architect on that project?
6    A.   I assume so.
7    Q.   Well, what do you mean you assume so?  Is there any
8         reason for you to believe you were not an intern
9         architect on that project?
10   A.   I didn't know what to believe at that time.
11   Q.   What did you do on that project?
12   A.   I was signed to coordinate medical equipment on the
13        floor plans.
14   Q.   Again, we discussed that a minute ago.  What do you
15        mean by that?
16   A.   I would take the list that was provided by the
17        client of the equipment that they had and then check
18        to place it on the plan in a graphic representation
19        to represent that equipment that related to the
20        floor plan in the building.
21   Q.   So you would take the floor plan and then you would
22        stick the medical equipment on the floor plan; is
23        that correct?
24   A.   Yes.
25   Q.   By doing that, were you ensuring that that
```

```
 1        particular medical equipment would actually work
 2        with the floor plan?
 3   A.   No.
 4   Q.   What were you doing by sticking it on the floor
 5        plan?
 6   A.   I was -- locations of where they wanted it in the
 7        building.
 8   Q.   So you were adjusting the floor plan to represent
 9        the locations of the medical equipment; is that
10        correct?
11   A.   That's correct.
12   Q.   In doing that, did you ever have any conversations
13        with the mechanical engineers as far as whether the
14        equipment will work in the particular location where
15        the client requested it to be?
16   A.   I don't recall if I did or not, on that.
17   Q.   Is that something that an intern architect who was
18        assigned that duty would have done?
19   A.   I don't know.
20   Q.   Let me ask you:  If you had not consulted with the
21        mechanical engineers to determine whether the
22        medical equipment would work in the requested
23        location, how would you actually know if it would
24        work?
25   A.   I wouldn't.  That's not really our job.  It's the
```

1       contractor that's building the building.

2    Q.  So was it just your job to update the floor plan

3        accordingly?

4    A.  That's correct.

5    Q.  Did you do anything else on the Tishomingo project?

6    A.  I called the product reps to discuss some of the

7        equipment.

8    Q.  And I take it when you say product reps, you mean

9        the product reps for the medical equipment?

10   A.  That's correct.

11   Q.  Do you recall what kind of things you would

12       discuss?

13   A.  "When are you going to send me CAD files so I can

14       put them in the drawing?"  "I need your electrical

15       information so I can send it to the electrical

16       engineer so he can check locs, so he can design the

17       electrical panels."

18   Q.  So you would have discussions with the

19       representatives for the medical equipment so you

20       could understand how to place the equipment in the

21       floor plan; is that correct?

22   A.  No.  It's more of getting the information of cut

23       sheets of the equipment so that the engineers could

24       coordinate the requirements for that equipment.

25           And the cut sheet, define that as -- it tells

1      you all the technical requirements of that

2      equipment, plan, detail, et cetera, et cetera, et

3      cetera.  I mean it's specific to each manufacture

4      that makes anything in the U.S., or in the world.

5   Q.  What else did you do on the Tishomingo project?

6   A.  I don't recall doing anything else other than that.

7      That was the bulk of my task.

8                   (Exhibit 4 marked.)

9   Q.  (By Mr. Short)  Mr. Hess, I'm going to hand you

10      what I have marked as Exhibit 4 to your deposition.

11   A.  Okay.

12   Q.  Have you seen this e-mail before?

13   A.  I guess I have.

14   Q.  From looking at this e-mail, do you recall what

15      project this e-mail related to?

16   A.  I'm not sure which project that is.  I'm not sure

17      if it's the Vinita or the Tishomingo.  I'd have to

18      read over the whole thing to see.

19   Q.  Well, will you mind reading through this e-mail and

20      then giving me a general summary of what kind of

21      work you're doing in this e-mail here?

22   A.  I was relaying information that -- questions came

23      up in a meeting and I was relaying those particular

24      items in the e-mail to Jennifer Caperton.

25   Q.  Do you recall who was in the meeting that the

1      questions about these particular items came up with,

2      or who was in the meeting when --

3   A.  I do not recall.

4   Q.  -- those issues came up?

5   A.  I do not recall, sir.

6   Q.  Now, take a look there at question number 14.

7   A.  Okay.

8   Q.  It states, "Door 12-12a, location has a conflict -

9      it moved or the wall moved - what to do?  Move it to

10     work with the landing."

11         If you can, generally tell me what the issue

12     there is.

13  A.  This is pure speculation on my part, but that

14     nomenclature of 12-12a indicates a door in a

15     particular location on the plan and it has a

16     conflict, so we had to move it so it wouldn't and I

17     was asking what should I do?  Which is the

18     appropriate decision?

19  Q.  So is it your understanding that you noted or

20     determined that there was a conflict that needed to

21     be changed and you asked about the change?

22  A.  Well, it states in the top here, it says,

23     "Questions from the other day, plus more."  I don't

24     know if that was a question from someone and I was

25     just relaying it in the e-mail or it was a question

```
 1        that I was asking.
 2   Q.   Do you recall working on a Chickasaw health clinic
 3        in Ardmore, Oklahoma?
 4   A.   Yes.
 5   Q.   Were you a project manager on that project?
 6   A.   I'm not sure if that project is the one I thought
 7        was in Tishomingo or the one that's in -- because --
 8        I'm not sure.  I know that there's one project that
 9        was in Tishomingo and there was one in Ardmore,
10        because we went to Ardmore.  We met in Ada and went
11        into Ardmore.  So I don't know which project that
12        one specifically is that you're referring to, but I
13        know of what the project looked like.  I was working
14        with another person at the time.  I can't remember
15        his name.
16   Q.   Well, let me ask you this:  Do you recall working
17        on both a project in Tishomingo and a project in
18        Ardmore?
19   A.   I believe so.
20   Q.   The project in Ardmore, would you have been working
21        as an intern architect on that project?
22   A.   I believe so.
23   Q.   Do you recall what type of work you did?
24   A.   Pretty much the same stuff that we did at the other
25        projects that I worked on.
```

1   Q.   Again, what would have been that same stuff?  Would

2        you have developed a design on that project?

3   A.   No.

4   Q.   Would you have developed a floor plan?

5   A.   Maybe.

6   Q.   Do you recall if you actually did develop the floor

7        plan on that project?

8   A.   I don't recall.

9   Q.   Did you work on the floor plan at all?

10  A.   I think I maybe modified some things on the floor

11       plan.

12  Q.   Do you recall what you modified?

13  A.   No.

14  Q.   Again, on this project, when you needed to modify

15       something on the floor plan, how would you go about

16       doing that?

17  A.   You go into Revit and modify the program.

18  Q.   Do you recall working on a project for the

19       University of Arkansas?

20  A.   Yes, I do.

21  Q.   Were you the project manager on that project?

22  A.   No.

23  Q.   Were you an intern architect on that project?

24  A.   I assume so.

25  Q.   Now, you say you assume so.  Is there any reason to

1   believe that you were not an intern architect on

2   that project?

3   A.  Well, the tasks that I was doing were not

4   indicative of an intern architect.

5   Q.  But you were, in fact, an intern architect at the

6   time; is that correct?

7   A.  That's correct.  I still am an intern architect.

8   Q.  What sort of tasks did you do on the University of

9   Arkansas project?

10  A.  I was a, to be frank, paper pusher.

11  Q.  What do you mean by that, paper pusher?

12  A.  I was orchestrating the layout out of the shop

13  drawings for Shane Boren.

14  Q.  How does someone orchestrate layout of shop

15  drawings?

16  A.  Well, you have to keep track of when the paper was

17  received and I'd note that and then also send the

18  information off to whoever was to check it.

19  Q.  What sort of paperwork are you talking about?

20  A.  It's shop drawings.

21  Q.  If you can, explain to me what a shop drawing is.

22  A.  Shop drawing is an item or a kind of representation

23  of what the contractor or subcontractors are

24  proposing to build or supply to meet their contract

25  requirements for the building.

1   Q.   So you would receive these drawings from a

2        contractor; is that correct?

3   A.   That's correct.

4   Q.   What would you do once you received the drawing

5        from a contractor?

6   A.   I would log it to see that we actually received it

7        and then I would send it off to the appropriate

8        person that was supposed to review it.

9   Q.   Who would that appropriate person be?

10  A.   An engineer, mainly structural, mechanical,

11       electrical, all the people that were reviewing -- or

12       things that needed to be reviewed by them.

13  Q.   Well, you mentioned structural, mechanical, and

14       electrical engineers.  How would you determine which

15       engineer to send the shop drawing to?

16  A.   Well, if it was the structural beams, it would go

17       to the structural engineer.  If it was

18       architectural, it would go to the office for -- I

19       can't remember the firm that was designing the

20       project.

21  Q.   How would you know if it was structural or beams?

22  A.   It would state the spec section of what that area

23       was and it would say structural beams, so you would

24       send that to the structural engineer.

25  Q.   What was the next step after sending the shop

1      drawings off to the engineers?
2  A.  If it needed to go to someone else, I would -- if
3      that needed to go to -- back to the contractor --
4      because they either got approval or it wasn't
5      approved.  But it always went back to the contractor
6      and then they had to have their subcontractors
7      resubmit that shop drawing to us so then we could
8      have the structural engineer, mechanical,
9      electrical, architect.
10          And the architect wasn't actually Childers; it
11     was Smith Group or something of that -- I can't
12     remember their -- for that project.
13 Q.  Who did you work with on the University of Arkansas
14     project?
15 A.  Shane Boren.
16 Q.  Did Shane do any work as far as processing the
17     submittals?
18 A.  Yes.
19 Q.  So was this work divided up 50/50, or how was it
20     divided up?
21 A.  It wasn't divided up 50/50.  He wanted me just to
22     do all the cataloging, which is basically say when
23     it came in and get it out, process it, and send it
24     back to whoever needed to receive it, that
25     information.

1   Q.   Now when you say "process it," what do you mean by

2        "process it"?  What would you do?

3   A.   Date stamp it, when you received it, and then log

4        it, say that you received it in a little form that

5        Shane had come up with and then send it by ground

6        mail or airmail or overnight it to whoever needed to

7        review it as quick as possible.

8   Q.   Did you ever have any discussions with the

9        contractors regarding the shop drawings?

10  A.   I believe so.

11  Q.   What sort of things would you discuss with them?

12  A.   "Where is my shop drawings?"

13  Q.   Would you discuss anything else?

14  A.   They said that they need -- "We need these shop

15       drawings.  Can you please process those quicker?"

16       That's the questions they would ask.

17  Q.   Did you ever have any discussions with engineers or

18       consultants regarding the for shop drawings?

19  A.   I don't know if I did or not.  I mean I would I

20       think I might have.  I don't know for sure.

21  Q.   What was the importance of cataloging and

22       processing the shop drawings and ensuring that they

23       got out quickly?

24  A.   My understanding is that you have to make sure

25       that -- you're supposed to have them done in a

```
 1        timely manner or they do not -- it can cause
 2        project -- delays in the project.
 3   Q.   Did you do any other work on the University of
 4        Arkansas project?
 5   A.   Not to my knowledge.
 6   Q.   Okay.
 7   A.   I might have.  I don't recall.  Mainly it was the
 8        bulk of just checking -- not checking, but just
 9        processing.  I did not check shop drawings; I just
10        processed them and sent them to the appropriate
11        people.
12   Q.   What other projects do you recall working on at
13        Childers?
14   A.   I think it was a master plan of -- or something for
15        the Cherokee Nation.
16   Q.   What type of project was that?
17   A.   It was something that Shane had been working on and
18        he asked me to help him get that done.
19   Q.   Do you recall what he asked you to do?
20   A.   Briefly, yeah.  Vaguely.
21   Q.   What is that?
22   A.   Well, there was a couple different sites that the
23        Cherokee Nation owned land on and he wanted me to
24        come up with some graphics to submit to the
25        Cherokees to present the ideas of what they might
```

```
 1        that correct?
 2   A.   That was one of the reasons, yes.
 3   Q.   What were the other reasons?
 4   A.   Actually, I think that's the only reason.
 5                    (Exhibit 5 marked.)
 6   Q.   (By Mr. Short)  Mr. Hess, I'm going to hand you
 7        what I have marked as Exhibit 5 to your deposition.
 8   A.   Okay.
 9   Q.   Have you seen this document before?
10   A.   No.
11   Q.   I'm going to represent to you that this is a
12        termination notice.  Do you recall when you were
13        terminated from your employment with James Childers
14        Architect?
15   A.   Yes.
16   Q.   When was that?
17   A.   I believe it was 6/10/2001.
18   Q.   That's what this note says.  Is there any reason
19        that that wouldn't be correct?
20   A.   I don't believe so.
21   Q.   How did you know you were being terminated?
22   A.   I was told by Shane Boren.
23   Q.   What did Shane tell you?
24   A.   Said I was being let go.
25   Q.   Did he tell you why you were being let go?
```

## THOMAS J. HESS JR.

3007 S. Joplin Pl. Tulsa, Ok 74114  918.835.8617  e-mail:architjhess@gmail.com

### Highlights

**Designer**
Church master planning
Hospital master planning
Retail master planning
Healthcare design
Assisted living design
Independent living design
Medical office design
Dentist office design
Restaurant design
Professional sound studio
Commerical office design
Wellness garden design
Historic preservation
Tensile structure design
Fire station design
Museum design
Strip mall design
Bank design

**Technical skills**
Programming
Schematics
Contract documents
Specifications
Shop drawing review
Material and Standards
Design research
ADA audits
Cost estimating
Project scheduling
Building code review
Site planning & analysis
Product research
Peer review

**Computer skills**
REVIT 2010
AutoCAD 2010
SketchUp Pro 7.1
Photoshop 7.0
Illustrator 10.0
Microsoft Excel
Microsoft Word
Microsoft Power point

**Interpersonal skills**
Team player
Public relations
Tact and diplomacy

## Professional experience:

### Fritz Bally, P.C. Architects, Planners & Designers, Tulsa, OK
Lead Designer/Intern Architect 2003 -2009
*Designed new prototype branch bank office (First Oklahoma Bank).
*Designed 26 million dollar addition for Muskogee Regional Hospital. Assisted on all phases of the project.
*Designed City of Tulsa fire stations (9&16).
*Designed Cherokee Strip Regional Heritage Museum in, Enid, OK.
*Assisted on City of Tulsa - Master plan for the New Fire Training Center/ Homeland security/ Urban search & rescue.

### Boynton Williams & Associates Architects & Planners, Tulsa, OK
Project Manager/ Intern Architect 2001-2003
*Completed project programming, design development and site development for a new student activity center at Catoosa High school. Coordinated design development and working drawings with the construction manager, to meet the 6.5 million dollar budget.
*Designed an addition to the existing fine arts building at the Bixby High school.
*Designed new basketball & gymnasium building for Wilson public High School.

### McFarland Architects, P.C. Tulsa, OK
Project Manager/ Intern Architect 1995-2001
*Co-designed and managed multi-million dollar rural healthcare projects. I worked on all aspects of the design process and project management for 25 plus healthcare projects.
*Completed design of 5.0 million dollar addition to Madill hospital, was responsible for site visits two times a month for project observation and coordination.
*Job Captain for a 15 million dollar design/ build project that retrofitted an existing Montgomery Ward in Tyler, Texas into surgical hospital and medical offices for several doctors.
*Marketing Experience: Set up and coordinated marketing booth at all Oklahoma Hospital Associations (once a year) since first employed. I gained a minimum of one solid marketing lead each year.

### Benham Group, Tulsa, OK
Intern Architect 1994-1995
*Assisted on construction documents for repairs to preserve 8 WPA picnic shelters in Mohawk Park as well as designed a new two story picnic shelter/ equestrian announcer booth for rodeo area in the park.
*Assisted on construction documents for numerous Weyerhaeuser's industrial recycling division plants in the United Sates.

### Homesteaders, Inc. and Five Star Homes, Inc., Norman, OK
Home Designer 1993-1994
*Meet with clients, designed custom or speculative houses, rendered brochures and recruited fellow architectural classmates for expanding business.

## Education:

### Bachelor of Architecture 1994
The University of Oklahoma, Norman, Oklahoma

## Professional membership:

Associate member of American Institute of Architects

Portfolio & References available upon request

**EXHIBIT**
exhibit

**3**

1

IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OKLAHOMA


TOM HESS,                     )
                             )
          Plaintiff,          )
                             )
      -vs-                    )Case No. 11-CV-482-GKF-FHM
                             )
JAMES R. CHILDERS             )
ARCHITECT, INC., a            )
corporation                   )
                             )
          Defendant.          )
                             )

*  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *


*DEPOSITION OF RODNEY SHANE BOREN*

TAKEN ON BEHALF OF THE PLAINTIFF

TAKEN AT 2 WEST 2ND STREET

TULSA, OKLAHOMA

SEPTEMBER 18, 2012


*  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *


BALLARD REPORTING
611 WEST 15TH STREET, C-3
TULSA, OKLAHOMA  74127
(918) 949-3811


*  *  *  *  *  *  *  *


REPORTED BY:  MILLIE BALLARD, CSR



A P P E A R A N C E S

FOR THE PLAINTIFF:    FRANK W. FRASIER
                           FRASIER, FRASIER & HICKMAN
                           1700 Southwest Boulevard
                           Tulsa, Oklahoma 74107

FOR THE DEFENDANT:    KENNETH T. SHORT
                           DOERNER, SAUNDERS, DANIEL & ANDERSON
                           2 West 2nd Street
                           Suite 700
                           Tulsa, Oklahoma 74103

\* \* \* \* \* \* \* \*

S T I P U L A T I O N S

    It is hereby stipulated and agreed by and between the parties hereto, that this deposition is being taken pursuant to agreement and that the same may be taken at this time and place.

    It is further stipulated and agreed that all objections are reserved to the time of trial, except as to form, with the same force and effect as if made at the taking of the deposition.

1   Q.   How long have you and Laura been married?  Trick
2        question.
3   A.   Yes, that is a trick question.  1995.
4   Q.   What is your profession or occupation?
5   A.   Intern architect.
6   Q.   What does an intern architect do?
7   A.   I think it depends on the day.
8   Q.   I understand that.
9   A.   But generally, working in various phases of a
10       project and preparing documents, whether that's
11       through design or production.  Coordinating with
12       consultants.  Processing the papers that come in
13       from consultants -- or from the contractor for
14       submittal.  So reviewing submittals, make sure those
15       were getting returned to the contractor.  That's all
16       part of the construction administration phase.  I
17       don't know.  There's lots of things, so --
18   Q.   It's a pretty varied job; is that correct?
19   A.   Yes, that's correct.
20   Q.   If I ask you something here today and you give me a
21       shake of the head, Ashley is really good, but I want
22       to have a clear record, so I might say, "Is that a
23       yes?" or "Is that a no?"
24   A.   Right.
25   Q.   If you give me an "uh-huh" or "huh-uh," I'm not

1        trying to be rude or a jerk, I just want to do this

2        once.

3    A.  I understand.

4    Q.  You probably feel the same way.

5    A.  Yes.

6    Q.  So tell me, what makes an intern architect

7        different than a regular architect?

8    A.  It's my understanding that an intern architect

9        cannot stamp drawings and sign and seal the

10       drawings.  So I would assume that there's a

11       knowledge that the architect has that an intern

12       architect does not have to be able to sign them and

13       say that these are legitimate documents or --

14   Q.  Is there a licensure component to that?

15   A.  Yes.

16   Q.  Does an intern architect have the necessary

17       licensure to sign and do those documents?

18   A.  No, they do not.

19   Q.  So - and if I'm wrong, let me know -- my

20       understanding is that an intern architect may or may

21       not have been licensed by the state or whatever

22       regulatory body in order to sign blueprints or other

23       things that an architect might create.

24   A.  It's my understanding that an intern architect

25       would not have been.  That's my understanding.

1   Q.   I apologize if I said that wrong, but that's what I

2        meant.  This is good.  We're communicating.

3            Tell me, in preparation for meeting me or

4        Mr. Hickman here today, did you review any

5        documents?

6   A.   Last night, I tried to go through my e-mail and see

7        if there's anything that would help me refresh my

8        memory.

9   Q.   Did you find anything?

10  A.   I did find one e-mail from Jennifer -- was it from

11       Jennifer?

12  Q.   Who is Jennifer?

13  A.   Caperton.

14  Q.   Do you know how to spell her last name?

15  A.   C-a-p-e-r-t-o-n.

16  Q.   Who is Jennifer Caperton?

17  A.   She is an intern architect.

18  Q.   I've not asked this; I've just made the assumption:

19       Where are you an intern architect?

20  A.   Tahlequah.

21  Q.   As a solo practitioner?  Do you work at a business?

22  A.   I work for Childers Architect.

23  Q.   How long have you worked for them?

24  A.   Since 2006.

25  Q.   Now, back to Jennifer.  Has she remained an intern

1   A.   Not the official name.

2   Q.   That's fine.

3   A.   State Board of Architects.

4   Q.   All right.  I didn't say I have good questions, but

5        they're mine; okay?

6   A.   Right.

7   Q.   Thank you for that background and helping educate

8        me.

9             We talked about those two e-mails.  There

10       aren't any other documents that you reviewed?

11  A.   No, sir.

12  Q.   You've been listed as a witness in this case.  Do

13       you have that understanding?

14  A.   Yes.

15  Q.   What things do you plan on telling the jury during

16       the trial of this matter?

17  A.   I'll answer whatever questions I'm asked

18       truthfully.

19  Q.   I don't doubt that.  I mean I think you've been

20       truthful with me here today.  But is there some

21       specific knowledge about the work that Mr. Hess did

22       when he worked at this company that you know about?

23  A.   I know what he did on the U of A project, yes.

24  Q.   Tell me about that.

25  A.   He was responsible for receiving the information

1       from the contractors, logging it into our system,

2       and then getting it out to the consultants for

3       review.  Then when the consultants sent it back, he

4       would send it back on to the contractor.

5   Q.  Were those responsibilities that were delegated to

6       him?

7   A.  Yes.

8   Q.  By you?

9   A.  Yes.

10  Q.  So it really wasn't the work of an intern

11      architect, was it?

12  A.  That would be the work of an intern architect.  I

13      mean I did that same work and many others in our

14      office do that same work that are intern architects.

15  Q.  But an intern architect isn't an architect.

16  A.  No.  That's correct.

17  Q.  Did he do work on this project that was not

18      something an intern architect would do?

19  A.  I'm an intern architect, and everything I asked him

20      to do, I did.  So I would say no, he didn't.

21  Q.  Well, you did them concurrently or it was at a

22      point in your tenure at this company where you --

23  A.  I did them on that project.  I've also done them on

24      previous projects and I've done them on projects

25      since.

IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OKLAHOMA


TOM HESS,                        )
                                 )
            Plaintiff,           )
                                 )
        -vs-                     )Case No. 11-CV-482-GKF-FHM
                                 )
JAMES R. CHILDERS                )
ARCHITECT, INC., a               )
corporation                      )
                                 )
            Defendant.           )
                                 )

*   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *


*DEPOSITION OF JENNIFER HART*

TAKEN ON BEHALF OF THE PLAINTIFF

TAKEN AT 2 WEST 2ND STREET

TULSA, OKLAHOMA

SEPTEMBER 18, 2012


*   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *


BALLARD REPORTING
611 WEST 15TH STREET, C-3
TULSA, OKLAHOMA  74127
(918) 949-3811


*   *   *   *   *   *   *


REPORTED BY:  MILLIE BALLARD, CSR

EXHIBIT
5

A P P E A R A N C E S


FOR THE PLAINTIFF:          FRANK W. FRASIER
                            FRASIER, FRASIER & HICKMAN
                            1700 Southwest Boulevard
                            Tulsa, Oklahoma 74107


FOR THE DEFENDANT:          KENNETH T. SHORT
                            DOERNER, SAUNDERS, DANIEL &
                            ANDERSON
                            2 West 2nd Street
                            Suite 700
                            Tulsa, Oklahoma 74103



                  *   *   *   *   *   *   *   *



            S T I P U L A T I O N S


        It is hereby stipulated and agreed by and
between the parties hereto, that this deposition is
being taken pursuant to agreement and that the same may
be taken at this time and place.

        It is further stipulated and agreed that all
objections are reserved to the time of trial, except as
to form, with the same force and effect as if made at
the taking of the deposition.

1   A.   I graduated in 2003.

2   Q.   What did you study?

3   A.   Bachelor of Architecture is my degree.

4   Q.   Do you have any education beyond that Bachelor of

5       Science?

6   A.   No, and it's a Bachelor of Architecture.

7   Q.   Okay.  I'm a better lawyer than I am architect;

8       okay?  Please forgive me if my questions are

9       inartful or wrong, it's just really my ignorance;

10      okay?

11          After graduating from school from Arkansas,

12      what did you do?

13   A.   I went to work for a firm in Fort Smith for a year

14      and then they downsized and then I went to work for

15      James.

16   Q.   And been there ever since?

17   A.   Yes.

18   Q.   That first place you worked, what was the name of

19      it?

20   A.   MAHG Architecture.

21   Q.   What did you do for them?

22   A.   I was an intern architect.

23   Q.   What does an intern architect do?

24   A.   A little of everything.

25   Q.   That's kind of what Shane said.  Maybe it's what

1       does an intern architect not do is a better

2       question.  Would you agree with that?

3   A.  That would be easier to answer.  In my experience,

4       it would be easier to answer.

5   Q.  In your experience, tell me what an intern

6       architect doesn't do.

7   A.  Deal with billing and contracts, mostly.

8   Q.  Billing for the clients and contracts with the

9       clients?

10  A.  Yes.

11  Q.  So then you went to work for this company.  What

12      was the first position you held with them?

13  A.  I was an intern architect.

14  Q.  And today, are you an intern architect?

15  A.  Yes.

16  Q.  Tell me if you would, please, how your duties and

17      responsibilities have changed over these eight

18      years.

19  A.  There has not been a lot of change.  When I

20      started, I worked in design and planning and through

21      construction documents.  It was a little while

22      before I got into the construction administration

23      side of it, but for the most part, it's been

24      continuous.

25  Q.  Do you make any drawings, either on CAD or by hand?

```
1   A.   Yes.
2   Q.   Of what types of things?
3   A.   The whole project, like everything it encompasses,
4        starting with drawing out just design ideas on plans
5        to the finished documents.
6   Q.   Do a lot of detail work ever?
7   A.   Yes.
8   Q.   Now, are you able, as an intern architect in
9        Arkansas, to sign off on those plans?
10  A.   No, I do not have a stamp or seal to sign.
11  Q.   Shane described to me in his deposition the process
12       by which you go through to get that licensure in
13       Oklahoma.  Do you know if it's the same in Arkansas?
14  A.   I don't know if it's exactly the same.  I would
15       assume it's very similar to it.
16  Q.   Tell me how it works in Arkansas.
17  A.   Typically once you graduate, you have a three-year
18       internship and then you are -- once you've completed
19       what's called the IDP, Intern Development Program,
20       you apply, they give you permission to test, and
21       then you have seven different tests you take.
22  Q.   But you can't test concurrently with the IDP?
23  A.   Not in Arkansas, that I'm aware of.  It wasn't when
24       I graduated.
25  Q.   Where are you in that process?
```

1   Q.   At some point, you met Mr. Hess?

2   A.   Yes.

3   Q.   Were you in the interview that he had with the

4        defendant?

5   A.   No.

6   Q.   Do you know who hired him?

7   A.   Not specifically who did.

8   Q.   Do you know what his first job was when he came to

9        work there?

10  A.   I believe he was working on the Vinita health

11       clinic, but I may be wrong.

12  Q.   I asked a bad question, and I'm sorry.  What I

13       meant to ask you was:  What did he hire on to do?

14       What was his label?

15  A.   My understanding is that he was hired to be a

16       project manager, to oversee the coordination of one

17       of our projects.

18  Q.   And that would be the project in Vinita.

19  A.   Yes.

20  Q.   Now, how is that project manager position different

21       from an interim or intern architect?

22  A.   They're not different.  I'm an intern architect and

23       I do project management also.  We all do the same

24       thing, all the interns do.

25  Q.   Are there people at your employer who are project

1      managers who are not intern architects?

2   A.   No.

3   Q.   Have there ever been?

4   A.   Not that I'm aware of.

5   Q.   When Mr. Hess came to work there, did you work on

6        this project in Vinita with him?

7   A.   No.

8   Q.   At any point, did you work on a project with

9        Mr. Hess?

10  A.   Yes.

11  Q.   Tell me that dynamic or that relationship by first

12       telling me which project it was.

13  A.   It was the Ardmore health clinic.

14  Q.   Did you have to go to Ardmore?

15  A.   I didn't go.

16  Q.   Oh, okay.  I was going to apologize.

17           What was your role in that Ardmore project?

18  A.   I was project managing, doing the coordination.

19  Q.   What was Mr. Hess's role, if you recall?

20  A.   He was working in production and design.

21  Q.   My understanding from Mr. Boren is that it's kind

22       of a team process.

23  A.   Yes.

24  Q.   And that there's also a team leader?

25  A.   Yes.

1   Q.   At that Ardmore project, who was the team leader?

2   A.   I was.

3   Q.   And in that role, did you delegate responsibilities

4        to Mr. Hess?

5   A.   Yes.

6   Q.   What kind of things did you delegate to him?

7   A.   In a project, there's certain drawings that are

8        due, and I would take the general drawings, for

9        example, floor plans or sections and divide those

10       among the team members on who needed to work on

11       what.

12  Q.   So that division is done.  Are they responsible for

13       adding any detail to those sections?

14  A.   Yes.

15  Q.   And they do everything from the ground all the way

16       up to doing drawings, I guess?

17  A.   Yes.

18  Q.   But then ultimately, somebody in charge is going to

19       sign off on it.

20  A.   The licensed architect will sign off.

21  Q.   And you agree with me, while the work you do is

22       both professional and I'm sure you do it in a

23       professional manner, as an intern architect, you're

24       not professional by definition?

25            MR. SHORT:   Object to the form.

1      started working on the Ardmore project.

2  Q.  Did expectations of the employees at your work

3      change with the change from Casey to you or

4      whomever?

5  A.  No.

6  Q.  Were things done differently in that point of time?

7  A.  I can't really answer that, because I wasn't

8      working on the other projects and I don't know how

9      those projects were being ran.

10 Q.  At any time during that one project, the Ardmore

11     project you worked on with Mr. Hess, were you-all

12     peers?

13 A.  I would say we were on the same level, it was just

14     I was in charge of making sure the project got done.

15 Q.  To quote President Truman, the buck stopped with

16     you.

17 A.  Yes.

18 Q.  I mean if it didn't get done, you were the person

19     responsible.

20 A.  Yes.

21 Q.  You delegated some responsibilities to Mr. Hess.

22 A.  Yes.

23 Q.  Although you worked in a team environment, you were

24     the person in charge of this Ardmore project.

25 A.  Yes.

1   A.   There was one time we did not.

2   Q.   Okay.

3   A.   Typically yes, but one time Tom and I actually went

4        down and met with the client for equipment planning

5        purposes.

6   Q.   Is that the exception and not the rule?

7   A.   No, it's not an exception.

8   Q.   So does it happen most of the time?

9   A.   Not most of the time.  I would say 30, 40 percent,

10       depending on what is being discussed.

11  Q.   So the large majority of the time, when people from

12       your employer and you meet with clients, there's a

13       principal, there's an architect there during those

14       meetings?

15  A.   Yes.

16  Q.   Why is that?

17  A.   Because they are the main contact with the client

18       with our firm.

19  Q.   And that's the business relationship those clients

20       have bought is with the architect.

21  A.   Yes.

22  Q.   I mean no disrespect to you or to Tom, but they

23       didn't come to Childers Architect to hire you or

24       him; right?

25  A.   I would assume not.

1

IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OKLAHOMA


TOM HESS,                      )
                               )
           Plaintiff,          )
                               )
       -vs-                    )Case No. 11-CV-482-GKF-FHM
                               )
JAMES R. CHILDERS              )
ARCHITECT, INC., a             )
corporation                    )
                               )
           Defendant.          )
                               )

* * * * * * * * * * * * * * * * * *


*DEPOSITION OF BRECK CHILDERS*

TAKEN ON BEHALF OF THE PLAINTIFF

TAKEN AT 2 WEST 2ND STREET

TULSA, OKLAHOMA

SEPTEMBER 18, 2012


* * * * * * * * * * * * * * * * * *


BALLARD REPORTING
611 WEST 15TH STREET, C-3
TULSA, OKLAHOMA  74127
(918) 949-3811


* * * * * * * *


REPORTED BY:  MILLIE BALLARD, CSR

EXHIBIT

6

A P P E A R A N C E S

FOR THE PLAINTIFF:        FRANK W. FRASIER
                          FRASIER, FRASIER & HICKMAN
                          1700 Southwest Boulevard
                          Tulsa, Oklahoma 74107


FOR THE DEFENDANT:        KENNETH T. SHORT
                          DOERNER, SAUNDERS, DANIEL &
                          ANDERSON
                          2 West 2nd Street
                          Suite 700
                          Tulsa, Oklahoma 74103



                    *   *   *   *   *   *   *   *



                S T I P U L A T I O N S


        It is hereby stipulated and agreed by and

between the parties hereto, that this deposition is

being taken pursuant to agreement and that the same may

be taken at this time and place.

        It is further stipulated and agreed that all

objections are reserved to the time of trial, except as

to form, with the same force and effect as if made at

the taking of the deposition.

1   A.   Yes.  Yeah, three years internship and then a year

2        taking the tests.

3   Q.   It's seven tests; is that right?

4   A.   Yes.

5   Q.   Shane Boren was telling me earlier that -- I mean

6        what is that, about one ever other month?

7   A.   Just about, yeah.

8   Q.   That's a pain is what that is.  But there's a

9        reason for that; right?

10  A.   Yes.

11  Q.   Tell this jury why it's good to take those tests.

12       why is that healthy for the architecture profession?

13  A.   It prepares you to go into that profession.

14  Q.   Is it the test itself that gets you prepared?

15  A.   Not just that test, but internship.

16  Q.   You'd agree with me that there is a difference

17       between an intern and somebody like you who has got

18       the license.

19  A.   The main difference is the license.  There's a lot

20       of similarities to what an intern does and what I

21       do.

22  Q.   Sure.  I would think my paralegal would agree that

23       she does a lot of my work, and she's not a licensed

24       lawyer.

25            But licensed architects are held to a

**San Antonio, TX**: Bexar, Comal, Guadalupe, Wilson

**San Diego, CA**: San Diego

**San Francisco, CA**: Marin, San Francisco, San Mateo

**San Jose, CA**: Santa Clara

**Seattle-Bellevue-Everett, WA**: Island, King, Snohomish

**Tampa-St. Petersburg-Clearwater, FL**: Hernando, Hillsborough, Pasco, Pinellas

**Washington, DC-MD-VA-WV**: Alexandria City, Arlington, Berkeley, Calvert, Charles, Clarke, Culpeper, District of Columbia, Fairfax, Fairfax City, Falls Church City, Fauquier, Frederick, Fredericksburg City, Jefferson, King George, Loudoun, Manassas City, Manassas Park City, Montgomery, Prince Georges, Prince William, Spotsylvania, Stafford, Warren

## DEFINITIONS OF POSITIONS

**Department head/senior manager**: Senior management architect or nonregistered graduate; responsible for major department(s) or functions; reports to a principal or partner.

 **Project manager**: Licensed architect or nonregistered graduate with more than 10 years of experience; has overall project management responsibility for a variety of projects or project teams, including client contact, scheduling, and budgeting.

**Senior architect/designer**: Licensed architect or nonregistered graduate with more than 10 years of experience; has a design or technical focus and is responsible for significant project activities.

**Architect/designer III**: Licensed architect or nonregistered graduate with 8–10 years of experience; responsible for significant aspects of projects.

**Architect/designer II**: Licensed architect or nonregistered graduate with 6–8 years of experience; responsible for daily design or technical development of project.

**Architect/designer I**: Recently licensed architect or nonregistered graduate with 3–5 years of experience; responsible for particular parts of a project within parameters set by others.

**Third-year intern**: Unlicensed architecture school graduate in third year of internship; develops design or technical solutions under supervision of an architect.

**Second-year intern**: Intern in second year of internship.

**Entry-level intern**: Intern in first year of internship.

**Student**: Currently enrolled in an academic architecture program.

**Senior principal/partner**: Typically an owner or majority shareholder of the firm; may be the founder; titles may include President, CEO, or Managing Principal/Partner.

**Midlevel principal/partner**: Principal or partner; titles may include Executive or Senior Vice President.

**Junior principal/partner**: Recently made a partner or principal of the firm; titles may include Vice President or Associate Principal.

**Engineer (mechanical/electrical/plumbing)**—up to 5 years of experience.

**Engineer (mechanical/electrical/plumbing)**—more than 5 years of experience.

**Engineer (civil/structural)**—up to 5 years of experience.

**Engineer (civil/structural)**—more than 5 years of experience.

**Interior designer**—up to 5 years of experience.

**Interior designer**—more than 5 years of experience.

**Graphic designer**: Responsible for print, multimedia, Web, and/or environmental graphic design.

**Construction administrator**: Works with contractors ensuring that the design intent is followed.

**Specification writer**: Creates specifications, compiles and coordinates specification documents.

**CAD manager**: Responsible for implementation, standards, upgrades, and training of CAD technology.

**Architectural drafter**: Responsible for drafting, picking up redlines, and limited design drafting.

**Controller**: Analyzes financial status of organization and directs preparation of operating budgets.

**Bookkeeper**: Maintains and records business transactions; balances ledgers and prepares payroll/accounting reports.

**Accounting clerk**: Handles payroll, accounts payable/receivable, etc.

**Business development manager**: Responsible for developing new business leads by seeking out and establishing opportunities with potential clients.

**Marketing manager**: Manages production and staffing of marketing support materials and proposals.

**Marketing assistant**: Provides proposal production support and administrative support to aid marketing/business development.

**Human Resources director**: Responsible for HR in a multioffice firm.

**Human Resources manager**: Responsible for HR in a single office.

**Office manager**: Responsible for administrative support services, facilities, office equipment, vendors, etc.

**Administrative assistant**: Responsible for secretarial duties for a department, studio, or individual.

**Receptionist**: Greets clients; answers phone/switchboard; may have secretarial/administrative duties.

**Librarian**: Responsible for cataloging and research of books, samples, and products.

Copyright 2005 The American Institute of Architects

**EXHIBIT**

**7**

JRCA000001

*2*

# NEW HIRE INFORMATION FORM

## TO BE FILLED OUT BY EMPLOYEE:

Name: THOMAS JAMES HESS JR.  Social Security: 474·86·5599

Address: 3007 S. JOPLIN PLACE

City: TULSA   State: OKLAHOMA   Zip: 74114

County of Residence: TULSA COUNTY

Phone #: 918·835·8617   Cell/Mobile/Pager # 918·629·7351

Date of Birth: 12·19·1967   Sex (M/F): M

E-Mail Address: architjhess@gmail.com

Veteran Status: NON VETERAN   Race: Caucasian/White

1) Vietnam Era (1961-1975)  3) Other
2) Special Disabled Veteran  4) Non Veteran

1) American Indian or Alaskan Native
2) Asian
3) Black or African American
4) Caucasian/White
5) Hispanic or Latino
6) Native Hawaiian or other Pacific Islander
7) Two or More Races

In the case of an emergency, please contact:

ANGELA LEVANO DE HESS
Name

918·835·8617          WIFE
Phone Number          Relationship

## TO BE FILLED OUT BY COMPANY:

Company Name: James R. Childers Architect, Inc. Hire Date: 7.9.2010

[X] New Hire  [ ] Re-Hire  [ ] Full-Time  [ ] Part-Time   Department #: _____

Rate Of Pay: 52,500.00   JOB Title: Architect Intern

Pay Frequency: [X] WEEKLY  [ ] BI-WEEKLY  [ ] SEMI-MONTHLY  [ ] MONTHLY

W/C Code: _____   W/C Classification: _____

✓ Approved By: _CAAw____   Date: 7.12.10

EXHIBIT
8
_____

JRCA000018

**Mark Moll**

| | |
|---|---|
| **From:** | Tom Hess [tom@childersarchitect.com] |
| **Sent:** | Thursday, July 15, 2010 5:12 PM |
| **To:** | Bruce Roberson (brucer@foyconsulting.com); Ryan Ray (ryan.ray@harri: David.Thomas@hfa-ae.com; garyz@foyconsulting.com; jasonc@cardinal lerry@interiorlogistics.com; Scott Howard (showard@hfsd.org) |
| **Cc:** | Breck Childers; Shane Boren |
| **Subject:** | Re: Vinita Health Clinic-DD Documents-Final review |
| **Attachments:** | Vinita Health Clinic 07.13.10.skp |

*File WAS Attached* (handwritten)

Project team **for Cherokee Nation Vinita Health Clinic** in Vinita, Oklahoma
Jason Cotton(Civil), Bruce Roberson& Gary Zahorsky (Structural), Ryan Ray(MECH/plumbing), David Thc
(Electrical/IT), Scott Howard (landscaping) and Terry Dovan (equipment)

I want to introduce myself, since I will be the project architect/project manager working on this project.
I am still getting familiar with this project , but I have worked on numerous project of this scope and complexity.
With that said, Childers Architect has gotten approval for the Vinita floor plans and 3d Concept on 7/13/2010. So we
need to proceed to the next stage.
We needed to made some minor adjustments to the plans after the meeting and I am sending you the REVIT file, so
each consultant (MEP, structural, civil, landscaping and equipment consultant) can work on their respective part(s) of
the project. One part of the project that does not have final approval is the Pharmacy, but just do your best to work
around that area (with consultants that this might affect), until we can get this worked out with the client.

Since our FTP site is not working (for now) I am sending the REVIT file by the way of "www.YOUSENDIT.COM". You
should receive two e-mails this one and another one from" www.yousentit.com". The e-mail you should receive from"
yousendit" should give you instructions on how to download the file to your computer. Also see attached file for
massing/concept (Sketchup).

***The next project schedule goal as of 07/15/2010:***
*Design Development (final review) will be due in our office on or before August 11th, 2010.*

I am looking forward to working with all of you on this project.

Thanks,
Tom Hess, Project manager
tom@childersarchitect.com
Phone: (479) 783-2480
James R. Childers Architect, Inc.
314/316 Lexington Ave
Fort Smith, AR 72901


P.S.
**Current Vinita Project schedule:**
Design Dev. Review (final review : Aug 11th.
Cost Estimate Provided by Construction Manager: Aug. 25th
Value Engineering Meeting: Aug. 25th
65% Const. Docs. Review: Oct 6th
Cost estimate Provided by Construction Manager: Oct 20th
Value Engineering Meeting: Oct 20th



EXHIBIT
9

JRCA000003

**Mark Moll**

| | |
|---|---|
| **From:** | Tom Hess [tom@childersarchitect.com] |
| **Sent:** | Monday, October 04, 2010 10:05 AM |
| **To:** | Shane Boren |
| **Cc:** | Breck Childers |
| **Subject:** | Ardmore-equipment coordination issue |

Shane,

In reference to the equipment list that was provided by the client.
Equipment # 2975 Space saver CORP (Storage of medical records?) for Room 123- Health information Management.
The size of that equipment is larger than the room, (228inch=19'-0") wide by ( 192inches16'-0" deep) by a couple of feet in current configuration.
Can you clarify with the client if that is the size needed or is this a typo?

Implication to project:
If it is the correct size needed by the client, the room would have to be enlarged, which effects the POR, design of department, etc...

Thanks,

Tom , Project manager

phone: 479 783 2480
fax: 479 783 4844
James R. Childers Architect, Inc.
314/316 Lexington Ave
Fort Smith, AR 72901
tom@childersarchitect.com



**DEPOSITION**
**EXHIBIT**

JRCA000013



**PayPlus SOFTWARE**

Hess Jr, Thomas J
3007 S Joplin Pl
Tulsa, OK 74116435

Period: 01/01/10 to 12/31/10

| | |
|---|---|
| SEMI-PEO | |
| SocSecNum: 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 | |
| WaComp Code: AR-8601 | |
| Pay Rate 1: 1009.610 | SALARY |
| Pay Rate 2: .000 | |
| Pay Cycle: WEEKLY | |

James Childers Architect, Inc.    Federal Tax Setup:
Company Hire Date: 07/09/10    State Tax Setup: AR M 03
Subscriber Hire Dt: 07/09/10    Status: Full Time
Birthdate: 12/19/67    Termination Date:
Insurance Codes:    Dept 1:    Dept 2:

Local Tax 1:
Local Tax 2:
Local Tax 3:
AR M 03    50.00
.00
Active

Period: 01/01/10 to 12/31/10

| CHECKDATE | RATE | Hours REGULAR | Hours OVERTIME | Hours OTHER | Earnings REGULAR | Earnings OVERTIME | Earnings OTHER | GROSS PAY | FEDERAL | FICA | STATE | LOCAL | 401K | INSURANCE | OTHER | DIRECT DEPOSIT | NET PAY |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 07/16/10 | 126.20 | 8.000 | .000 | .000 | 1009.61 | .00 | .00 | 1009.61 | 119.85 | 77.24 | 53.94 | .00 | .00 | .00 | .00 | 758.58 | 758.58 |
| 07/23/10 | 23.08 | 43.750 | .000 | .000 | 1009.61 | .00 | .00 | 1009.61 | 119.85 | 77.24 | 53.94 | .00 | .00 | .00 | .00 | 758.58 | 758.58 |
| 07/30/10 | 22.69 | 44.500 | .000 | .000 | 1009.61 | .00 | .00 | 1009.61 | 119.85 | 77.24 | 53.94 | .00 | .00 | .00 | .00 | 758.58 | 758.58 |
| 08/06/10 | .00 | 48.000 | .000 | .000 | 1009.61 | .00 | .00 | 1009.61 | 119.85 | 77.24 | 53.94 | .00 | .00 | .00 | .00 | 758.58 | 758.58 |
| 08/13/10 | 25.24 | 40.000 | 16.000 | .000 | 1009.61 | 605.76 | .00 | 1615.37 | 210.72 | 123.57 | 96.35 | .00 | .00 | .00 | .00 | 1184.73 | 1184.73 |
| 08/20/10 | 25.24 | 40.000 | 24.500 | .000 | 1009.60 | 927.57 | .00 | 1937.17 | 285.98 | 148.19 | 118.87 | .00 | .00 | .00 | .00 | 1384.13 | 1384.13 |
| 08/27/10 | 23.48 | 43.000 | .000 | .000 | 1009.61 | .00 | .00 | 1009.61 | 119.85 | 77.24 | 53.94 | .00 | .00 | .00 | .00 | 758.58 | 758.58 |
| 09/03/10 | 23.48 | 43.000 | .000 | .000 | 1009.61 | .00 | .00 | 1009.61 | 119.85 | 77.24 | 53.94 | .00 | .00 | .00 | .00 | 758.58 | 758.58 |
| 09/10/10 | 31.55 | 32.000 | .000 | .000 | 1009.61 | .00 | .00 | 1009.61 | 119.85 | 77.24 | 53.94 | .00 | .00 | .00 | .00 | 758.58 | 758.58 |
| 09/17/10 | 27.66 | 28.500 | .000 | 8.000 | 788.31 | .00 | 221.30 | 1009.61 | 119.85 | 77.24 | 53.94 | .00 | .00 | .00 | .00 | 758.58 | 758.58 |
| 09/24/10 | 24.04 | 42.000 | .000 | .000 | 1009.61 | .00 | .00 | 1009.61 | 119.85 | 77.24 | 53.94 | .00 | .00 | .00 | .00 | 758.58 | 758.58 |
| 10/01/10 | .00 | 44.000 | .000 | .000 | 1009.61 | .00 | .00 | 1009.61 | 119.85 | 77.24 | 53.94 | .00 | .00 | .00 | .00 | 758.58 | 758.58 |
| 10/08/10 | 18.70 | 54.000 | .000 | .000 | 1009.61 | .00 | .00 | 1009.61 | 119.85 | 77.24 | 53.94 | .00 | .00 | .00 | .00 | 758.58 | 758.58 |
| 10/15/10 | .00 | 47.000 | .000 | .000 | 1009.61 | .00 | .00 | 1009.61 | 119.85 | 77.24 | 53.94 | .00 | .00 | .00 | .00 | 758.58 | 758.58 |
| 10/22/10 | .00 | 40.000 | .000 | .000 | 1009.61 | .00 | .00 | 1009.61 | 119.85 | 77.24 | 53.94 | .00 | .00 | .00 | .00 | 758.58 | 758.58 |
| 10/29/10 | 24.38 | 41.500 | .000 | .000 | 1009.61 | .00 | .00 | 1009.61 | 119.85 | 77.24 | 53.94 | .00 | .00 | .00 | .00 | 758.58 | 758.58 |
| 11/05/10 | 25.24 | 40.000 | .000 | .000 | 1009.61 | .00 | .00 | 1009.61 | 111.63 | 73.04 | 50.10 | .00 | .00 | 23.50 | 31.33 | 720.01 | 720.01 |
| 11/12/10 | .00 | 40.000 | .000 | .000 | 1009.61 | .00 | .00 | 1009.61 | 111.63 | 73.04 | 50.10 | .00 | .00 | 23.50 | 31.33 | 720.01 | 720.01 |
| 11/19/10 | 25.24 | 40.000 | .000 | .000 | 1009.61 | .00 | .00 | 1009.61 | 116.33 | 75.44 | 52.30 | .00 | .00 | 23.50 | .01 | 742.03 | 742.03 |
| 11/26/10 | 21.71 | 46.500 | .000 | .000 | 1009.61 | .00 | .00 | 1009.61 | 116.33 | 75.44 | 52.30 | .00 | .00 | 23.50 | .00 | 742.04 | 742.04 |
| 12/03/10 | 25.24 | 16.000 | .000 | 24.000 | 403.84 | .00 | 605.77 | 1009.61 | 116.33 | 75.44 | 52.30 | .00 | .00 | 23.50 | .00 | 742.04 | 742.04 |
| 12/10/10 | 25.24 | 40.000 | .000 | .000 | 1009.61 | .00 | .00 | 1009.61 | 116.33 | 75.44 | 52.30 | .00 | .00 | 23.50 | .00 | 742.04 | 742.04 |
| 12/17/10 | 25.24 | 40.000 | .000 | .000 | 1009.61 | .00 | .00 | 1009.61 | 116.33 | 75.44 | 52.30 | .00 | .00 | 23.50 | .00 | 742.04 | 742.04 |
| 12/17/10 | .00 | .000 | .000 | .000 | .00 | .00 | 578.33 | 578.33 | 10.33 | 44.25 | 23.75 | .00 | .00 | .00 | .00 | 500.00 | 500.00 |
| 12/23/10 | 25.24 | 40.000 | .000 | .000 | 1009.61 | .00 | .00 | 1009.61 | 116.33 | 75.44 | 52.30 | .00 | .00 | 23.50 | .00 | 742.04 | 742.04 |
| 12/30/10 | 25.24 | 8.000 | .000 | .000 | 201.92 | .00 | 807.69 | 1009.61 | 119.85 | 77.24 | 53.94 | .00 | .00 | .00 | .00 | 758.58 | 758.58 |

EXHIBIT
10

Hess Jr, Thomas J
3007 S Joplin Pl
Tulsa, OK 741146435

Period: 01/01/10 to 12/31/10

SEMI-PEO
SocSecNum: 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
WkComp Code: AR-8601
Pay Rate 1: 1009.610 SALARY
Pay Rate 2: .000
Pay Cycle: WEEKLY

James Childers Architect, Inc.   Federal Tax Setup:
Company Hire Date: 07/09/10      State Tax Setup:    AR  M  03
Subscriber Hire Dt: 07/09/10     Status: Full Time Active
Birthdate: 12/19/67              Termination Date:
Insurance Codes:                 Dept 1:
                                 Dept 2:

Local Tax 1:
Local Tax 2:
Local Tax 3:

Period: 01/01/10 to 12/31/10

AR  M  03   50.00
            .00

| CHECKDATE | HOURS | | | EARNINGS | | | PAY | TAXES | | | | | DEDUCTIONS | | DIRECT | NET |
| RATE | REGULAR | OVERTIME | OTHER | REGULAR | OVERTIME | OTHER | GROSS | FEDERAL | FICA | STATE | LOCAL | 401K | INSURANCE | OTHER | DEPOSIT | PAY |
| TOTALS | 996.000 | 40.500 | 64.000 | 23605.48 | 1533.33 | 2213.09 | 27351.90 | 3221.32 | 2070.93 | 1459.87 | .00 | .00 | 188.00 | 94.00 | 20317.78 | 20317.78 |

| Earnings Hours | | Earnings Amounts | | Taxes | | Deductions | |
|---|---|---|---|---|---|---|---|
| Regular | 996.00 | Regular | 23605.48 | FICA-OASDI | 1678.41 | Direct Deposit | 20317.78 |
| Overtime | 40.50 | Overtime | 1533.33 | FICA-Medicare | 392.52 | EE Missed Prem | 94.00 |
| Holiday | 24.00 | Holiday | 625.15 | Federal | 3221.32 | PreTax Insurance | 72.40 |
| SICK/PTO | 8.00 | SICK/PTO | 201.92 | Arkansas | 1459.87 | Depend. Ins Prtx | 115.60 |
| VAC/PTO | 32.00 | Bonus | 578.33 | | | | |
| | | VAC/PTO | 807.69 | | | | |

PayPlus
SOFTWARE


PayPlus
SOFTWARE

Hess Jr, Thomas J
3007 S Joplin Pl
Tulsa, OK 74116435

Period: 01/01/11 to 09/21/11

| | | SEMI-PED | | James Childers Architect, Inc. | Federal Tax Setup: | | | Local Tax 1: | |
|---|---|---|---|---|---|---|---|---|---|
| | | SocSecNum: 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 | | Company Hire Date: 07/09/10 | State Tax Setup: | | OK M 03 | Local Tax 2: | 50.00 |
| | | WkComp Code: OK 8601 | | Subscriber Hire Dt: 07/09/10 | Status: Full Time | | OK M 03 | Local Tax 3: | .00 |
| | | Pay Rate 1: 1009.610 | SALARY | Birthdate: 12/19/67 | Termination Date: 06/10/11 | | Term'd | | |
| | | Pay Rate 2: .000 | | Insurance Codes: | Dept 1: | | | | |
| | | Pay Cycle: WEEKLY | | | Dept 2: | | | Period: 01/01/11 to 09/21/11 | |

| | | HOURS | | | EARNINGS | | | | | | TAXES | | | DEDUCTIONS | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| CHECKDATE | RATE | REGULAR | OVERTIME | OTHER | REGULAR | OVERTIME | OTHER | GROSS PAY | FEDERAL | FICA | STATE | LOCAL | 401K | INSURANCE | OTHER | DIRECT DEPOSIT | NET PAY |
| 01/07/11 | 25.24 | 16.000 | .000 | 24.000 | 403.84 | .00 | 605.77 | 1009.61 | 116.33 | 55.72 | 52.30 | .00 | .00 | 23.50 | .00 | 761.76 | 761.76 |
| 01/14/11 | .00 | 48.000 | .000 | .000 | 1009.61 | .00 | .00 | 1009.61 | 116.33 | 55.72 | 52.30 | .00 | .00 | 23.50 | .00 | 761.76 | 761.76 |
| 01/21/11 | .00 | 56.000 | .000 | .000 | 1009.61 | .00 | .00 | 1009.61 | 126.76 | 55.72 | 52.30 | .00 | .00 | 23.50 | .00 | 751.33 | 751.33 |
| 01/28/11 | 21.89 | 38.250 | .000 | 8.000 | 837.29 | .00 | 175.12 | 1012.41 | 127.18 | 55.87 | 52.49 | .00 | .00 | 23.50 | .00 | 753.37 | 753.37 |
| 02/04/11 | .00 | 46.500 | .000 | .000 | 1009.61 | .00 | .00 | 1009.61 | 126.76 | 55.72 | 52.30 | .00 | .00 | 23.50 | .00 | 751.33 | 751.33 |
| 02/11/11 | .00 | 2.500 | .000 | .000 | 1009.61 | .00 | .00 | 1009.61 | 126.76 | 55.72 | 52.30 | .00 | .00 | 23.50 | .00 | 751.33 | 751.33 |
| 02/18/11 | 24.62 | 41.000 | .000 | .000 | 1009.61 | .00 | .00 | 1009.61 | 126.76 | 55.72 | 52.30 | .00 | .00 | 23.50 | .00 | 751.33 | 751.33 |
| 02/25/11 | .00 | 61.750 | .000 | .000 | 1009.61 | .00 | .00 | 1009.61 | 126.76 | 55.72 | 52.30 | .00 | .00 | 23.50 | .00 | 751.33 | 751.33 |
| 03/04/11 | 21.14 | 47.750 | 17.750 | .000 | 1009.61 | 672.02 | 1769.96 | 3451.59 | 678.12 | 193.69 | 223.24 | .00 | .00 | 23.50 | .00 | 2333.04 | 2333.04 |
| 03/11/11 | .00 | 41.250 | .000 | .000 | 1009.61 | .00 | .00 | 1009.61 | 126.76 | 55.72 | 52.30 | .00 | .00 | 23.50 | .00 | 751.33 | 751.33 |
| 03/18/11 | 19.60 | 51.500 | .000 | .000 | 1009.61 | .00 | .00 | 1009.61 | 126.76 | 55.72 | 52.30 | .00 | .00 | 23.50 | .00 | 751.33 | 751.33 |
| 03/25/11 | 21.36 | 47.250 | .000 | .000 | 1009.61 | .00 | .00 | 1009.61 | 126.76 | 55.72 | 52.30 | .00 | .00 | 23.50 | .00 | 751.33 | 751.33 |
| 03/31/11-14278.10 | .00 | .000 | .000 | .000 | .00 | .00 | .00 | .00 | .00 | .00 | .00 | .00 | .00 | .00 | .00 | -798.73 | -798.73 |
| 03/31/11-14278.10 | .00 | .000 | .000 | .000 | .00 | .00 | .00 | .00 | .00 | .00 | -798.73 | .00 | .00 | .00 | .00 | 798.73 | 798.73 |
| 03/31/11 | .00 | .000 | .000 | .000 | .00 | .00 | .00 | .00 | .00 | .00 | .00 | .00 | .00 | .00 | .00 | .00 | .00 |
| 04/01/11 | .00 | 43.500 | .000 | .000 | 1009.61 | .00 | .00 | 1009.61 | 126.76 | 55.72 | 52.30 | .00 | .00 | 23.50 | .00 | 751.33 | 751.33 |
| 04/01/11 | 23.21 | .000 | .000 | .000 | .00 | .00 | .00 | .00 | .00 | .00 | .00 | .00 | .00 | .00 | .00 | .00 | .00 |
| 04/08/11 -1972.22 | .00 | .000 | .000 | .000 | .00 | .00 | .00 | .00 | .00 | .00 | -104.60 | .00 | .00 | .00 | .00 | -104.60 | -104.60 |
| 04/08/11 | 16.82 | 60.000 | .000 | 8.000 | 1009.61 | .00 | .00 | 1009.61 | 126.76 | 55.72 | 52.30 | .00 | .00 | 23.50 | .00 | 751.33 | 751.33 |
| 04/15/11 | 13.51 | 74.750 | .000 | .000 | 1009.61 | .00 | .00 | 1009.61 | 126.76 | 55.72 | 52.30 | .00 | .00 | 23.50 | .00 | 751.33 | 751.33 |
| 04/22/11 | 15.84 | 55.750 | .000 | 8.000 | 883.08 | .00 | 126.53 | 1009.61 | 126.76 | 55.72 | 52.30 | .00 | .00 | 23.50 | .00 | 751.33 | 751.33 |
| 04/29/11 | 16.42 | 53.500 | .000 | 8.000 | 878.25 | .00 | 131.36 | 1009.61 | 130.29 | 57.04 | 52.30 | .00 | .00 | .00 | .00 | 790.28 | 790.28 |
| 05/06/11 | 15.84 | 54.250 | .000 | .000 | 1009.59 | .00 | .00 | 1009.59 | 126.78 | 55.72 | 52.30 | .00 | .00 | .00 | .00 | 772.61 | 772.61 |
| 05/13/11 | 14.74 | 68.500 | .000 | .000 | 1039.70 | .00 | .00 | 1009.70 | 126.76 | 55.72 | 52.30 | .00 | .00 | .00 | .00 | 772.70 | 772.70 |
| 05/20/11 | 18.61 | 32.250 | .000 | 21.000 | 1039.70 | .00 | 398.16 | 1009.70 | 126.76 | 55.72 | 52.30 | .00 | .00 | .00 | .00 | 772.70 | 772.70 |
| 05/27/11 | 24.93 | 40.500 | .000 | .000 | 1009.61 | .00 | .00 | 1009.61 | 126.76 | 55.72 | 52.30 | .00 | .00 | .00 | .00 | 772.63 | 772.63 |
| 06/03/11 | 18.70 | 54.000 | .000 | .000 | 1009.61 | .00 | .00 | 1009.61 | 126.76 | 55.72 | 52.30 | .00 | .00 | .00 | .00 | 772.63 | 772.63 |

**PayPlus SOFTWARE**

Hess Jr Thomas J
3007 S Joplin Pl
Tulsa, OK 741146435

Period: 01/01/11 to 09/21/11

| | | SPM-PEO | James Chalders Architect, Inc. Federal Tax Setup: | | Local Tax 1: | | |
|---|---|---|---|---|---|---|---|
| | | SocSecNum: 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 | Company Hire Date: 07/09/10   State Tax Setup: | | OK  M 03 | 50.00 | Local Tax 1: |
| | | WkComp Code: OK-8601 | Subscriber Hire Dt: 07/09/10   Status: Full Time | | OK  M 03 | .00 | Local Tax 2: |
| | | Pay Rate 1: 1009.610  SALARY | Birthdate: 12/19/67   Termination Date: | | Term'd | | Local Tax 2: |
| | | Pay Rate 2: .000 | Insurance Codes:   Dept 1: | | 06/10/11 | | Local Tax 3: |
| | | Pay Cycle: WEEKLY | Dept 2: | | Period: 01/01/11 to 09/21/11 | | Local Tax 3: |

| | | HOURS | | | EARNINGS | | | | TAXES | | | | DEDUCTIONS | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| CHECKDATE | RATE | REGULAR | OVERTIME | OTHER | REGULAR | OVERTIME | OTHER | GROSS PAY | FEDERAL | FICA | STATE | LOCAL | 401K | INSURANCE | OTHER | DIRECT DEPOSIT | NET PAY |
| 06/10/11 | 24.62 | 41.000 | .000 | .000 | 1009.61 | .00 | .00 | 1009.61 | 126.76 | 55.72 | 31.00 | .00 | .00 | 23.50 | .00 | 772.63 | 772.63 |
| 06/17/11 | 25.24 | .000 | .000 | 40.000 | .00 | .00 | 1009.61 | 1009.61 | 126.76 | 55.72 | 31.00 | .00 | .00 | 23.50 | .00 | 772.63 | 772.63 |
| 08/05/11 | .00 | .000 | .000 | .000 | .00 | .00 | 50.00 | 50.00 | 50.00 | 3.98 | .00 | .00 | .00 | .00 | -70.50 | 16.52 | 16.52 |
| TOTALS | | 1075.750 | 17.750 | 109.000 | 21786.96 | 672.02 | 4216.51 | 26675.49 | 3626.71 | 1480.70 | 1214.33 | .00 | .00 | 540.50 | -70.50 | 19883.75 | 19883.75 |

| Earnings Hours | | Earnings Amounts | | Taxes | | Deductions | |
|---|---|---|---|---|---|---|---|
| Regular | 1075.75 | Regular | 21786.96 | FICA-OASDI | 1100.69 | Pretax Insurance | 208.15 |
| VAC/PTO | 64.00 | VAC/PTO | 1615.38 | FICA-Medicare | 380.01 | Depend Ins Prtx | 332.35 |
| Holiday | 16.00 | Holiday | 306.48 | Federal | 3626.71 | Direct Deposit | 19883.75 |
| Overtime | 17.75 | Overtime | 672.02 | Arkansas | .00 | Refund Prem Prtx | -70.50 |
| SICK/PTO | 29.00 | Retro Pay | 1769.96 | Oklahoma | 1214.33 | | |
| | | SICK/PTO | 524.69 | | | | |



**A Human Resource Outsourcing Company**
P.O. Box 6040
Van Buren, Arkansas 72956
Phone (479) 474-7752   Fax (479) 474-2101

**Employer** _James R. Childers Architect, Inc._

### TERMINATION / SEPARATION NOTICE

Please be informed that as of _6.10.2011_ the following employee is no longer working for the above employer.
*(Effective date)*

_Tom Hess_           _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_
**Employee Name**           **Employee SS Number**

**Type and Reason for Termination/Separation**
*(Please check all that apply)*

☐ **Voluntary Termination (1)**

| | | |
|---|---|---|
| ☐ Another Job (B) | ☐ No Call, No Show (N) | ☐ Personal Reasons (H) |
| ☐ No Notice Given (G) | ☐ Walk Out (W) | ☐ Relocated/Moved (M) |
| ☐ Unknown (U) | ☐ Other (O) _____ | ☐ Client Terminated (S) |

☑ **Involuntary Termination (2)**

| | | |
|---|---|---|
| ☐ Replaced/Not a Good Fit (R) | ☑ Lack of Work/Lay Off (L) | ☐ Insubordination (I) |
| ☐ Theft (T) | ☐ Position Eliminated (E) | ☐ Positive Drug Screen (P) |
| ☐ Failure to Perform Job Duties (F) | ☐ Excessive Absenteeism/Tardiness (A) | ☐ Business Closed (C) |
| ☐ Deceased (D) | ☐ Administrative Termination (X) | ☐ Client Terminated (S) |
| ☐ Other (O) _____ | ☐ Time Theft (K) | ☐ Falsification of Records (J) |

**Explanation or Additional Comments:**

6.10.2011 is his last day.

(If more space is needed, please use the back of this sheet)

_6.8.11_      _J. Basel CA-00_      **Architect**
Date      Authorized Signature      Title

| **OFFICE USE ONLY** | HR | PR |
|---|---|---|

P:/SPMI/Forms/Human Resources/2009 Forms/2009 Termination Form-20090504



EXHIBIT
**11**

JRCA000025

Westlaw

Not Reported in F.Supp.2d, 1998 WL 751636 (E.D.La.)
**(Cite as: 1998 WL 751636 (E.D.La.))**

Only the Westlaw citation is currently available.

United States District Court, E.D. Louisiana.
Mohammad TAVASSOL, et al
v.
HEWITT–WASHINGTON & ASSOCIATES,

No. CIV.A. 97–3278.
Oct. 23, 1998.

OPINION

BERRIGAN, District J.

*1 This matter was tried before the Court without a jury on October 1, 1998, and taken under advisement. Having considered the evidence adduced at trial, the record, the memoranda of counsel and the law, the Court finds in favor of the defendants, Hewitt–Washington & Associates, Architects–Planners, Inc. ("Hewitt–Washington"), James R. Washington, Jr. ("Washington") and Lonnie Hewitt ("Hewitt") and against the plaintiff, Mohammad Tavassol ("Tavassol").

Tavassol brought three related claims under the **Fair Labor Standards Act,** 29 U.S.C. § 201 *et seq* ("FSLA") raising the issue whether he was subject to the "professional" exemption from the FSLA overtime provisions 29 U.S.C. § 207 and § 213.[FN1] These claims include a claim for the overtime wages, a claim for liquidated damages and a claim for attorneys fees.

> FN1. At trial, Tavassol abandoned a claim for alleged underpayment on a federal contract and a claim for penalty wages under La.Rev.Stat. § 23:631.

Some of the relevant facts were essentially undisputed at trial. Tavassol received a degree in **architecture** from the University of Southern Louisiana in 1988, but has not passed the exam required for a license. He worked for Hewitt–Washington from June 1994 to December 1996. The primary factual issues at trial surrounded the nature of the

work the plaintiff performed at Hewitt–Washington and the basis of his pay. The defendants claim that the plaintiff is **exempt** from the **FLSA** overtime provisions by virtue of his status as a "salaried **professional**" employee, and the plaintiff claims that he is not so **exempted**.

The employer bears the burden of proving that employees are exempt from the overtime requirements. *Idaho Sheet Metal Works, Inc. v. Wirtz,* 383 U.S. 190, 86 S.Ct. 737, 15 L.Ed.2d 694 (1966); *Dalheim v. KDFW–TV,* 918 F.2d 1220 (5th Cir.1990). The exemption for the "professional" is construed narrowly against the employer. *Arnold v. Ben Kanowsky, Inc.,* 361 U.S. 388, 80 S.Ct. 453, 4 L.Ed.2d 393 (1960); *Dalheim, supra.*

Section 213 extends this **exemption** to "any employee employed in a bona fide ... **professional** capacity." That term is defined in 29 C.F.R. § 541.3 as an employee:

(a) Whose primary duty consists of the performance of:

(1) Work requiring knowledge of an advanced type in a field of science or learning customarily acquired by a prolonged course of specialized intellectual instruction and study, as distinguished from a general academic education and from an apprenticeship and from training in the performance of routine mental, manual, or physical processes ...

... and ...

(b) Whose work requires the consistent exercise of discretion and judgment in its performance; and

(c) Whose work is predominately intellectual and varied in character (as opposed to routine mental, manual, mechanical, or physical work) and is of such character that the output produced or the result accomplished cannot be standardized in re-



EXHIBIT

12

Not Reported in F.Supp.2d, 1998 WL 751636 (E.D.La.)
**(Cite as: 1998 WL 751636 (E.D.La.))**

lation to a given period of time; and

(d) Who does not devote more than 20 percent of his hours worked in the workweek to activities which are not an essential part of and necessarily incident to the work described in paragraphs (a) through (c) of this section; and

**\*2** (e) Who is compensated for services on a salary or fee basis of not less than $170 per week ...

That term is explained further in the regulations: "It includes those professions which have a recognized status and which are based on the acquirement of **professional** knowledge through prolonged study ." 29 C.F.R. § 541.300. **Architecture** is specified as a "learned" profession "generally" recognized as meeting the requirements: "The typical symbol of the **professional** training and the best prima facie evidence of its possession is, of course, the appropriate academic degree, and in these professions an advanced academic degree is a standard (if not universal) prerequisite." 29 C.F.R. § 541.301(e)(1).

The defendants presented credible evidence through testimony. Washington, the Vice President of Hewitt–Washington, testified that the plaintiff was hired as a production/project architect for an annual salary of $27,000, although on two or three occasions he received extra pay for overtime. He testified that Tavassol performed the duties of an production/project architect while at Hewitt–Washington. Kurt Hagstette ("Hagstette"), an architect from another firm, testified that he managed a team which included Tavassol for several months on the Sports Arena project. Hagstette indicated that Tavassol was assigned certain portions of the Sports Arena building and allowed to "run with it" with virtually no supervision. Hagstette testified that the plaintiff spent 100% of his time involved with the "CAD" machine when they worked together on that project.

The plaintiff testified that at the interview with

Hewitt–Washington, he asked for pay based on an hourly rate but was offered pay based on an annual salary, which he accepted. He agreed that he received overtime pay on two or three occasions. He also testified that he performed nearly all of his work on the "CAD" and was always supervised. The plaintiff testified that labor codes on his time sheets indicating that he performed substantial periods of time on other architecture-related functions such as code research and specification writing were incorrect.

The testimony also established that the CAD machine is the vehicle used to produce architectural drawings in the modern architecture firm. Drawings are made on the CAD, and changes to those drawings are made on the CAD. The CAD provides those drawings in disk form as well as on paper. The testimony also established that all public bids in New Orleans and in Louisiana require drawings in CAD on computer disk. In sum, the work of the architect ends up in the CAD machine.

Assuming that the Court could find the testimony of Tavassol credible, he still clearly meets the definition of a "learned professional" under the regulations. Even if architecture was not identified as a learned profession in the regulations, consideration of the individual factors set forth in the regulations yields the same conclusion.

**\*3** Tavassol meets the first requirement of prolonged study with his degree in architecture. Neither the statute nor the regulations require that a professional be licensed. With regard to the second factor, Tavassol apparently argues the fact that he had a supervisor while at Hewitt–Washington and did not originate the drawings. However, this factor focuses on the exercise of discretion and judgment, not leadership or lack of supervision. It does not require that the employee be the "lead" professional. Therefore, any supervision does not detract from the clearly established fact that he did exercise the requisite discretion and judgment in the work he performed, even if the majority of that work was on the CAD machine.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1998 WL 751636 (E.D.La.)
**(Cite as: 1998 WL 751636 (E.D.La.))**

Again assuming the majority of the work Tavassol was on the CAD machine, this work was predominately intellectual and varied in nature for purposes of the third factor. The end result of the CAD process was the equivalent of architect's drawings, which clearly meets the standard set forth in this factor.

The defendants have established the last two factors relevant to the **professional exemption**. As indicated previously, accepting as true the plaintiff's testimony that he worked nearly exclusively with the CAD machine, that piece of equipment is the centerpiece of the modern day **architectural** undertaking. While the plaintiff tried to raise suspicion from the fact that he occasionally received overtime, the overwhelming evidence and all of the credible evidence indicates that he was always a salaried rather than hourly employee while working at Hewitt–Washington. The fact that he received additional compensation on two or three occasions "is not inconsistent with the salary basis of payment." 29 C.F.R. § 541.118(b).

Additionally, the plaintiff's lack of credibility detracts from his entire case. His testimony was rife with basic inconsistencies attendant to persistent "explanations" as to why something was not as it appears. His memory was too convenient, and the "neutral" testimony of Hagstette directly contradicted the plaintiff's testimony on the key issues in this matter. In addition, the plaintiff felt comfortable about including major misrepresentations on his resume. This lack of truthfulness also impacts on the reliability of the hours indicated by him on his time sheets, which underlie his claim for overtime.

Accordingly,

IT IS ORDERED that judgment be entered in favor of the defendants, Hewitt–Washington & Associates, Architects–Planners, Inc ., James R. Washington, Jr. and Lonnie Hewitt and against the plaintiff, Mohammad Tavassol, dismissing the plaintiff's claims with prejudice.

E.D.La.,1998.
Tavassol v. Hewitt-Washington & Assoc.
Not Reported in F.Supp.2d, 1998 WL 751636 (E.D.La.)

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.